## HOOD RIVER ORCHARD CO. *v.* STONE.

(191 Pac. 662.)

**Agriculture—Member of Fruit Growers' Association Held Entitled to Surplus After Cancellation of Membership.**

1. A member of a fruit-growers' incorporated association, having a by-law providing that cancellation of membership surrendered the membership, together with all benefits accruing thereunder and all right and interest of every kind and nature, *held* entitled on cancellation of his membership to part of a surplus on hand arising out of charges for handling fruits under contracts providing that members were entitled to *pro rata* share of any amount which should remain after payment of charges and expenses.

**Agriculture—Statements Rendered Member of Fruit Growers' Association Held not to Show Acquiescence in Business Methods Followed.**

2. In an action by one who had been a member of a fruit-growers' incorporated association for a part of a surplus in the hands of the association, the rendering of annual statements to the plaintiff *held* not to show that plaintiff acquiesced in the business methods followed by the association in regard to creating a surplus, where such statements contained nothing more than the amount of sales of plaintiff's fruit, together with the sum which the association had been paid, not including or in any manner referring to charges made for handling, storage, etc.

From Hood River: ROBERT G. MORROW, Judge.

Department 2.

The plaintiff, which we shall hereafter designate as the Orchard Company, is an Oregon corporation engaged in the raising of apples, pears, and other fruits in Hood River Valley. The defendant Apple

Growers' Association, which we shall hereafter designate as the association, is an Oregon corporation organized in April, 1913, "to handle, distribute and market the fruits, produce and by-products of the Hood River Valley and vicinity; to purchase, lease or otherwise acquire, sell, pledge, mortgage, improve, use and operate warehouses, packing plants, cold-storage plants, ice-plants and all other plants and facilities useful or convenient in handling, marketing and distributing the fruits, produce and by-products of the Hood River Valley and vicinity"; generally, to promote and encourage the growing of high-grade fruit, to "protect the good name and commercial value of the fruit," to minimize the expense of its handling, to bring the producers and consumers nearer together, and to do everything tending to promote the interests of the fruit-growers of Hood River Valley, whether stockholders in the association or not; also, "to buy and sell merchandise and other personal property and real property, to borrow money and to pledge and mortgage any of the property of the corporation to secure the indebtedness of the corporation." Its principal office is at Hood River and its capital stock is $10,000, divided into 10,000 shares of the par value of one dollar each. The remaining defendants are the officers and directors of the association, except as to Thomas Avery, who is a member only.

At the time of its organization the association adopted a set of rules known as "Stockholders' By-Laws of the Apple Growers' Association of Hood River." In these by-laws it was set out that the general manager of the corporation should have "full authority to enter into contracts with the growers of fruit, for the sale and storage of fruit and for the assorting and packing of the same, pro-

vided, however, that said contracts shall be in accordance with the rules and regulations of the board of directors." On April 4, 1914, a form of contract was adopted by a mass meeting of the growers, and readopted by the board of directors on April 16th. About the same time, "Members' By-Laws of the Apple Growers Association of Hood River" were adopted, reading in part as follows:

### Article I.

"Section 1. Any grower who has ratified and accepted these by-laws and holds with this association an unexpired co-operative growers contract, in the form adopted April 4th and 16th, 1914, shall be and hereby is designated, constituted, and created a 'Member.'

"Section 2. If at any time the standard co-operative growers contract with the association, in the form adopted April 4th and 16th, 1914, is canceled or abandoned for any cause whatsoever, such cancellation or abandonment shall *ipso facto* cancel and terminate the membership of such grower, together with all benefits accruing thereunder, and all voting power, right, and interest of every kind and nature shall thereupon immediately cease and terminate.

"Section 3. Any member of this association may, on ten days' notice, for failure to comply with the rules and regulations of this association, at any regular meeting or any special meeting called for that purpose, be expelled by a majority membership vote and a majority income vote, voting separately.

"Section 4. The expelling of any member shall *ipso facto* immediately cancel and terminate any and all growers' contracts such expelled member has with the association and this association shall thereupon immediately be relieved from handling the fruit of such expelled member. Nothing in these by-laws shall, however, be construed as releasing any member from any indebtedness to this association nor as releasing this association from any indebtedness to any member."

Provision is made for the nomination and election of directors, each member of the association being entitled to one vote, designated as a "membership vote," and additional votes in proportion to his tonnage of fruit, based upon one vote for each hundred boxes of fruit. It is further set forth that:

"Article X.

"Section 1.   During the month of July of each year an annual budget estimating the amount necessary to properly and economically conduct the business and affairs of the association for the ensuing year shall be prepared by the board of directors, and mailed to the members, and to cover such budget there shall be retained from the proceeds accruing from all business of the association a sufficient amount to cover all of the operating expense and payments of the association, which shall be based upon a handling charge of an equal amount for strawberries, pears and apples and half that amount for peaches in crates of the standard size and for cherries in 10-lb. boxes."

In the event that the charges fixed by the board of directors in the annual budget exceed twenty-two cents per box, the members are given the right to reduce the budget, at a called meeting, so that the cost shall not be greater than that sum. Further rules follow:

"Article X.

"Section 3.   The association reserves the right to return to the members, in the form of a dividend, a portion of the profits derived from the purchase and sale of merchandise.

"Section 4.   When the pools are finally closed, any amount over and above the actual amount necessary to properly and economically conduct the business and affairs of the association for such year as aforesaid, shall be returned to the members in the form of a dividend, based on an equal amount per box on apples, pears and strawberries and half that amount

97 Or.—11

on peaches in standard sized crates and cherries in 10-lb. boxes; the intent being that the amount so returned to the members shall be as near as possible in direct proportion to the income from tonnage of members * * as circumstances warrant."

Another article of the by-laws provides that in the event of a dissolution of the association or sale of its property the proceeds shall be divided among the members who at the time are in good standing, and holding unexpired contracts with the association, one half of such proceeds to be distributed equally among all of the members, and the other half to be divided "among such members as shall furnish an income to the association, and in direct proportion to the income." Payment of a membership fee of $10 is required of all new members joining the association after September 1, 1914.

The Orchard Company entered into the standard form of contract with the association, wherein it was recited that in consideration of the receipt of one dollar the parties agreed as follows: The grower should transfer and promise to deliver to the association its entire crop of fruit for the year 1914 and continuously every year thereafter, provided that the grower could cancel the contract on March 31st of any year, by giving written notice on or before March 20th of that year, delivering its copy of the contract to the association and paying any indebtedness due it. Failure so to notify the association would operate to continue the contract in force. The grower agreed to haul and pack its fruit in accord with the methods and rules of the association, and deliver it at Hood River at the grower's expense. The association agreed to handle and market the fruit with diligence "and to pay the grower such advances from time to time as sales warrant, and to pay the balance of the

net. proceeds obtained by it for the fruit, within thirty days after the receipt of the money for each pool of fruit.'' It was stipulated that the fruit delivered should be pooled by the association with other like fruit delivered under similar contracts, ''and that the proceeds of each pool shall be distributed by the association *pro rata* among the growers having fruit in such pools.'' In the event that ''the association shall pack the fruit, it shall be entitled to retain from the proceeds as a packing charge such sum as the association shall from year to year determine.'' The association was also permitted ''to retain from the proceeds a further sum not exceeding ten cents per box, for storage of such fruit as may be held and stored by it at Hood River, in cold storage, with the understanding that such sum is to be charged *pro rata* against the entire variety so stored.'' The association reserved the right to ''retain from the proceeds of the fruit and products handled by it, such further sum, as an advertising, handling, distributing, and marketing charge, as the association shall from year to year determine.'' For the year 1914 the association was permitted by the contract to retain as a handling charge not to exceed ten cents per package for strawberries, pears, and apples, and five cents for peaches or cherries in 10-pound packages. Each part of the pool was to receive the same price for the same variety, size, and grade of fruit. The association further reserved the right to withdraw from the pool any diseased fruit and handle it on a separate account. It was further stipulated that the contracts should become operative and binding whenever two thirds of the membership of the association holding contracts with it in the form adopted in 1913 should have executed like contracts, and not otherwise.

The plaintiff alleges that beginning with the year 1913 and ending in 1916, under the terms and conditions of such contract, it delivered to the association all of its fruit; that the association received and sold the same for the plaintiff; that from each crop delivered the association deducted from the proceeds of the sale large sums of money, which "were greatly in excess of the amounts necessary properly and economically to conduct the business and affairs of defendant corporation, and greatly in excess of the amount actually expended by said association in conducting its business and affairs in marketing said fruit"; that from such excess charges to the grower there has accumulated a large sum of money, funds, and assets, the exact amount of which is unknown to plaintiff, but which is about $80,000, and all of which is the property of and should be distributed to the growers under their respective contracts; "that all of the pools for the years 1913, 1914, 1915, and 1916 have been finally closed"; that plaintiff has demanded an accounting, statement, and payment of its portion of the money, but that the association has refused and continues to refuse to account or pay; and that there is due to plaintiff out of said funds about $1,000. It is then charged that the defendants threaten to, and unless restrained by an order of the court will, violate said contracts and agreements and will irreparably injure the plaintiff by wrongfully and unlawfully purchasing what is known as the "Union Property" at Hood River, subject to a mortgage of $80,000, and by assuming the mortgage and using or diverting such funds or assets as a part of the purchase price thereof, will thereby deprive the plaintiff and other growers of their interest in such funds.

Answering, the defendants admit the corporate character of the Orchard Company and of the associa-

tion; the execution of the standard form of contract as alleged; that it was in force and effect for the years mentioned; 'that the association received, handled, stored, and marketed plaintiff's fruit for those years under such contract; and that for more than three years its business methods and accounts were "acquiesced in, accepted, and approved by the plaintiff." As a further and separate defense the defendants allege the conditions existing prior to the organization of the association; that there was no co-operation or community of interest among the fruit-growers; that the association was formed to harmonize and consolidate their respective interests, at which time the Davidson Fruit Company, by H. F. Davidson, subscribed for 3,500 shares of its capital stock, the Hood River Apple Growers' Union subscribed for 6,500 shares, and the association then took over the business of those two companies; that the standard contract was then prepared, and that the "members' by-laws" were afterwards adopted, as alleged.

The answer further states that about May 1, 1913, the association leased for ten years certain real property of the growers' union, at an annual rental of $17,275, and certain real property of the Davidson Fruit Company, for a like period, at an annual rental of $9,750, the same being plants and warehouses of those companies operated by them prior to that time; that the capital stock of the association was not paid up in cash, but through the properties turned over to it as above stated; that 3,500 shares of its capital stock were issued to the Davidson Fruit Company, and 6,500 shares to the growers' union; and that on April 27, 1914, all of such stock for value was assigned by them to the Butler Banking Company, of Hood River, as trustee, except one share for each of

the directors. It is alleged that such stock is now held in trust for the use and benefit of all members of the association in good standing; that there are more than 800 individuals or corporations holding membership in the association; that they constitute about 75 per cent of the fruit-growers in the Hood River Valley; that in carrying on its business the association has made provision for furnishing to its members sprays, spraying materials, spray-hose, fertilizer, boxes, packing-paper, and other supplies necessary for cultivating the soil, caring for the fruit-trees, and packing and preparing the fruit for market, carrying individual growers for all these materials to the first of the calendar year after they were furnished; that it is not possible to separate, either actually or in an accounting, the operations of one year from those of another; that the association was organized as a permanent concern, to have in view the proper and economical administration of its affairs in the future, as well as the present; that it is essential to its prosperity that it should acquire the title to and permanently retain storage and ice plants; that, if its authority is confined to leasing of properties only, it will eventually be left entirely without facilities for carrying on its business; that the plaintiff is not a member of the association; and that of its own volition it canceled and terminated "all benefits accruing thereunder," as provided for in Section 2 of Article I of the members' by-laws.

The defendants claim that the plaintiff is not entitled to an accounting; that there is nothing due or owing to it from the association; and that by its actions and conduct it has acquiesced in and approved the business policies and methods of the association.

A demurrer to this answer was filed, on the ground that it did not state facts sufficient to constitute a

defense or answer to the complaint, but this was overruled. As a reply the plaintiff denies that for the years 1913, 1914, or 1915 the association ever rendered full or final statements; that such statements have ever been approved or accepted; that the association has ever made to the plaintiff or any member an accounting, or that its business methods have ever been acquiesced in or approved by the plaintiff. It traverses generally all of the material allegations of the further and separate answer.

Testimony was taken before Hon. W. L. BRADSHAW, who died before a decree was rendered. On July 10, 1917, a stipulation was entered into, to the effect that the cause should be submitted to the Circuit Court for Hood River County, before Hon. ROBERT G. MORROW, presiding as judge thereof, for the entering of a final decree, that no findings of fact or conclusions of law should be made or filed; that the validity of the decree should not be assailed by reason thereof, and that nothing in the stipulation should impair or affect the right of either party to appeal or to question the ruling of the court. On the same day a *pro forma* decree was rendered to the effect "that plaintiff take nothing by this suit; that this suit be and the same is hereby dismissed upon the merits"; that the temporary injunction be set aside and dissolved, and that the defendants recover their costs and disbursements.

The plaintiff appeals, claiming that the court erred in not sustaining its demurrer to the further and separate answer, in overruling its request for a decree in its favor, in dismissing the suit and in rendering a decree for the defendants.

REVERSED AND REMANDED.

For appellant there was a brief submitted over the names of *Mr. Ernest C. Smith* and *Messrs. Huntington & Wilson,* with oral arguments by *Mr. H. S. Wilson* and *Mr. Smith.*

For respondents there was a brief prepared and submitted over the names of *Mr. M. H. Clark, Mr. A. W. Stone, Mr. A. E. Clark* and *Mr. Fred W. Wilson,* with oral arguments by *Mr. M. H. Clark* and *Mr. Stone, in pro. per.*

JOHNS, J.—In its inception, the defendant association was organized to acquire and conduct the business of the Davidson Fruit Company and the growers'. union. In effect it was a consolidation of the interests of those two corporations. In consideration thereof, the association issued 3,500 shares of its capital stock to the Davidson Fruit Company and 6,500 shares to the growers' union, the amount of which was the total stock authorized by its articles of incorporation. In addition thereto, and as a part thereof, the association entered into written leases of the real property of those corporations for a period of ten years at a stipulated annual rental. No other consideration was paid for the capital stock. This was about May 1, 1913.

The association conducted the consolidated business along the usual and customary lines, under its then existing stockholders' by-laws, until it adopted what is known as the standard, or growers', contract. This was for the purpose of increasing the volume of its business, to combine all of the fruit-growers into one organization, so far as possible, and to place their fruit in a pool for marketing purposes, with a view of obtaining for the growers the best market price and maintaining the highest grade of fruit. After

the contract was prepared, a meeting of all of the growers was called, at which it was submitted and fully explained, and it was approved and accepted by about 75 per cent of the growers. Concurrent therewith, and as a part thereof, the growers then adopted the "members' by-laws," and thereafter delivered their fruit to the association under such contract and by-laws.

To satisfy the growers and protect their interests, and to insure the payment of the stipulated annual rentals to the Davidson Fruit Company and the growers' union, these corporations, on April 27, 1914, assigned to the association their respective registered brands and trademarks, and to the Butler Banking Company, as trustee, they assigned the 10,000 shares of capital stock which they then held. Article IV of the members' by-laws provides:

"Section 1.  All of the stock of the association shall be held by the Butler Banking Company, of Hood River, Oregon, as trustee, for the benefit of the members of this association as created herein, except that enough shall be assigned to individual members to qualify such members to act as directors and for no other purpose.

"Section 2.  It shall be the duty of the trustee to vote the capital stock of this association at all times as he is directed by a vote of the members taken in conformity with these by-laws."

Thereafter, in accord with their by-laws, the members of the association nominated the directors and certified that fact to the Butler Banking Company, trustee, which voted the 10,000 shares of stock it held, for the directors selected by the growers. These directors then met and elected the officers of the corporation. In this manner the business affairs of the association were conducted, after the members' by-laws were adopted; and the growers entered into

their respective contracts and delivered their fruit to the association.

It appears from the record that in 1913 the association handled 661,740 packages of fruit; in 1914, 651,842; in 1915, 494,834; and in 1916, 1,112,660 packages. Of this amount the plaintiff furnished, in 1913, 14,259 boxes of apples and 81 boxes of pears; in 1914, 10,630 boxes of apples and 80 boxes of pears; in 1915, 4,285 boxes of apples and 178 boxes of pears; and in 1916, 9,341 boxes of apples and 294 boxes of pears. It is also shown that in the year 1913 the association accumulated over and above all of its operating charges and expenses, $924.94; in 1914, $10,267.27; that in 1915 it suffered a loss of $2,307.46; and that in 1916 it cleared $68,562.13. The plaintiff claims that under its contract it is entitled to an accounting for and that it should have and receive its *pro rata* share of the income of the association for each of those years. It insists that a large amount of such accumulations was the result of excess charges to the growers, which should be returned, and for which the defendant should account under its respective contracts. This involves the construction of the contract and the liabilities of the association, under the members' by-laws, to an individual or corporation that has ceased to be a member. The contract provides that the association shall "pay the grower such advances from time to time as sales warrant and shall pay the balance of the net proceeds obtained by it, for the fruit, within thirty days after the receipt of the money for each pool of fruit." Provision is also made that the association shall be entitled to a charge for any fruit that it packs, in such amount as it shall from year to year determine; that it may retain a charge for storage, and a further sum for advertising, distributing, and

marketing, as it shall determine; and that it shall retain a handling charge, in different amounts named. Although the purposes for which such charges may be made are specified, the amount thereof is not certain or definite. As to the advertising and packing charges, the amount is left largely to the discretion of the association.

Under the terms and conditions of the contract, standing alone and complete within itself, the grower is entitled to receive each year the balance of any net proceeds from an annual pool, within thirty days after the receipt of the money by the association, and it is the duty of the association to render an annual statement of the receipts and disbursements of each pool. The record is conclusive that such statement was never made and such accounting was never rendered to the plaintiff; that after paying the expenses of the association named in the contract, there is a surplus estimated to be about $80,000. The defendants insist that the plaintiff is not entitled to any portion of it, and rely in particular upon Section 2 of Article I of the members' by-laws above quoted. It is conceded that the plaintiff canceled its membership voluntarily, and it is not now a member of the association. Under that section of the by-laws the cancellation ends "the membership of such grower, together with all benefits accruing thereunder and all voting power, right, and interest of every kind and nature shall immediately cease and terminate."

1. The question arises: What are the "benefits" which are terminated and surrendered? The plaintiff claims that its rights and liabilities are defined by the terms of the contract, which specifies the charges to be deducted from the selling price of its fruit, and that under the contract it is entitled to its *pro rata* share of any amount which may remain

after the annual pool is closed. The defendants contend that by reason of surrendering and canceling its membership the plaintiff has waived and lost its right to any share it may once have had in such proceeds. As we construe the record, the rights of the plaintiff for the sale of its fruit are specified and defined by the contract, by the terms of which the association is to pay and the plaintiff is to receive the amount for which its fruit was sold in the pool, less such fixed charges as might be ascertained and determined under the contract itself, and that when it surrendered its membership it did not lose its right to a *pro rata* share of any annual surplus of the association derived from its own growers' contracts. The words "benefits accruing thereunder," as defined in Section 2 of Article I of the members' by-laws, do not apply to a surplus accruing from the sale and purchase of fruit and charges therefor, under an express contract, but are confined and limited to the right, title, and interest which a corporation or individual may have in and to the net assets of the association by reason of membership therein subject to the payment of all its debts and liabilities. They do not give to the association the right to keep the money which it promised and agreed to pay another under its express contract. This construction is sustained by Article X of the members' by-laws, providing for the annual budget to be submitted to the members of the association during July of each year, which authorizes the association to retain from the proceeds accruing from all business a sufficient amount to cover all of the operating expenses and its payments, which shall be based upon a handling charge. Section 4 of that article provides that when the annual pools are closed "any amount over and above the actual amount necessary, properly, and economically to conduct the

business and affairs of the association'' shall be returned to the members in the form of a dividend. Article XI specifies that in the event of the dissolution of the association, or sale of its property, a distribution of the proceeds shall be made among such as shall be members at the time, and who hold an unexpired growers' contract.

Defendants cite and strongly rely on *Weber Implement & A. Co.* v. *St. Louis A. M. & D. Assn.,* 181 S. W. 1025 (Mo. App. unreported). That case states good law, but there is a vital distinction as to the facts between it and the instant case. There, as here, the plaintiff became a member of the defendant in 1909, and tendered its resignation in December, 1910, which was duly accepted on March 21, 1911. On its application the plaintiff was reinstated on June 2, 1911. There, the defendant's by-laws provided:

"No member shall be entitled to the return of any money advanced by him for the holding or promotion of the annual show, or for space at said show, unless he shall have been a member of this association at or prior to the last annual meeting preceding said show."

As the result of the automobile show the defendant association had left about 80 per cent of the total amount paid to it by members for floor space and refused to pay the plaintiff its share upon the ground that it was not a member "at or prior to the last annual meeting preceding said show," and plaintiff there instituted the action to recover 75 per cent of the moneys which it had paid to the defendant. The court held that it "was not entitled to its share of the association's refund to members, since, whether it was a new member or a reinstated member, it was not a member at or prior to the annual meeting in April, 1911."

It will also be noted that, while not a member, plaintiff claimed that it was entitled to a *pro rata* share of the assets of the corporation. Plaintiff here is seeking to recover from the defendant upon its growers' contract for the money which it alleged is due and owing under the terms of that contract. In other words, it is seeking to recover the balance of the selling price of fruit which it delivered to the association under an express contract, and which was handled and sold by the association under the contract. Its claim is not based upon a dividend or an order of distribution of the assets of the defendant corporation. It is founded upon an express contract. For such reason defendants' authorities on that question are not in point.

2. The defendants contend that the association has annually rendered final statements to the plaintiff, which have been accepted and approved, and that the plaintiff has acquiesced in the business methods followed by the association. Such statements, however, contain nothing more than the amount of sales of plaintiff's fruit, together with the sum which it has been paid. They do not include or in any manner refer to or specify the charges made, for handling, storing, advertising, or packing. There is nothing in them from which the plaintiff could determine the amount of such charges or of the surplus arising therefrom.

Much stress is laid by defendants upon the fact that H. F. Davidson was an officer and director of the defendant during a large period of the transactions; that at the same time he was a principal stockholder of the plaintiff, and that he knew or should have known of the business methods of the defendants. It is sufficient to say that Mr. Davidson is not a party

to this suit, and that the plaintiff is a corporation, with its rights defined by the terms of its contract.

It appears from the record that, in addition to the packing, handling, storing, and advertising of fruit belonging to members, the association has been engaged in other and different branches of business, in particular the advance of money and sale of merchandise to the growers, and that a portion of its accumulated profits are the result of its enlarged and combined business. It is probable that the litigants and expert accountants can determine from the large volume of its transactions the net amount of surplus which the association has realized from its contracts with the growers, and the amount of plaintiff's *pro rata* share. The record shows that the volume of business of the association during the years 1914, 1915, and 1916, when Mr. Stone was its manager, amounted to $3,075,693.59. There is no dispute as to the volume of business during each year, the amount of the annual profits, or the amount of fruit which the plaintiff delivered to the defendants under its growers' contracts. Upon these questions the testimony is clear, but it is not definite and certain as to how much of that surplus accrued from the growers' contract, or the amount of plaintiff's share, or as to how much profit the defendant made from all other branches of its business. The plaintiff has submitted figures which it claims should be the basis upon which the accounting should be made, and they may be right; but from the whole mass of figures before us we are not clear as to the amount of surplus which has accrued under or as the result of the growers' contracts; and we hold that the plaintiff, from the sales of its fruit under its contracts with the association, is entitled to its *pro rata* share of any surplus which may remain after payment of the

just and reasonable charges specified and defined in the standard contract.

The decree is reversed, and the cause remanded to the Circuit Court, with directions to ascertain and determine the amount of any surplus arising from or growing out of plaintiff's contracts in the pools of each year, and then to render in its favor a decree for such amount, together with costs and disbursements.

REVERSED AND REMANDED.

BENSON, BEAN and BENNETT, JJ., concur.