Argued at Pendleton May 2; affirmed June 7; rehearing denied
July 12, 1938

# DAVIDSON *v.* APPLE GROWERS ASSOCIATION

(79 P. (2d) 991)

474

In Banc.

*Jay H. Stockman* and *Ralph C. Hoeber*, both of Portland, for appellant.

*Ernest C. Smith*, of Hood River, and *W. B. Shively*, of Portland, for respondent.

KELLY, J.  It is admitted that on or about January 8, 1923, plaintiff and his predecessors in interest, as owners of 240 acres of orchard land known to this record as Hood River Orchards Company property, entered into a contract of sale thereof with D. O. Nunamaker, F. D. Nunamaker, N. N. Nunamaker, J. R. Nunamaker and M. O. Downing, hereinafter referred to as the purchasers, which contract granted the purchasers the right of possession of said real property, provided for the farming thereof, the harvesting of fruits thereafter to be grown thereon; and it was agreed in said contract that all of said fruit should be marketed through defendant under a separate account designated as Hood River Orchards Company account; that each box containing said fruit should be marked and stamped ''Hood River Orchards Co.'' and that said contract provided for the application of the net proceeds from said fruit upon the principal and interest of the agreed purchase price of said real property.

It is also admitted that defendant had notice of the sale of said premises to the purchasers on or about August 29, 1923, and that the crops to be grown thereon were to be marketed through defendant pursuant to the terms of the said agreement of January 8, 1923; that defendant should credit all of said fruit to the account of ''Hood River Orchards Co. Account'', and that defendant should pay all proceeds from the sale thereof to Butler Banking Company for disposition by it in compliance with the terms of the said agreement.

Defendant is a corporation incorporated under the general laws of Oregon with its principal office and place of business at Hood River.  During the times

mentioned herein defendant operated as a cooperative marketing association. To accomplish this system of operation, the capital stock of defendant, except the shares necessary to qualify its directors as such, was placed with the Butler Banking Company in trust for the benefit of the members of defendant corporation, and by-laws were adopted known as Members By-laws.

The members by-laws impose the duty upon the trustee bank to vote the capital stock as directed by a vote of the members. Each active grower member holds one vote designated as a membership vote, and in addition thereto each member holds votes in direct proportion to the tonnage delivered to the association the previous year, based upon one vote for each 100 boxes or fractional part thereof of apples, pears and strawberries; and of peaches in standard sized crates and cherries in 10-lb. packages, one vote for each 200 boxes or fractional part thereof. These additional votes are designated income votes.

To properly instruct the trustee to cast votes necessary to elect a director or pass a resolution or change any by-law or expel a member, it requires a majority of all of the membership votes voting at any meeting and also a majority of all the income votes voting at any meeting, said income votes and membership votes to be counted separately.

On or about November 4, 1922, N. N. Nunamaker entered into a contract with defendant for the delivery by said Nunamaker to defendant of his entire crop of merchantable apples, pears, strawberries and other fruit for the year 1923 and every year thereafter until or unless said contract should be canceled.

On January 14, 1927, the above mentioned growers' contract was assigned by N. N. Nunamaker to F. D.

Nunamaker and at said time said F. D. Nunamaker and Calla Nunamaker entered into a similar contract with defendant for the delivery of the crop for the year 1927 and subsequent years. A copy of this contract is marked exhibit A and attached to and made a part of plaintiff's complaint.

All of the fruit involved in this suit was delivered by the purchasers to defendant under and by virtue of the two growers' contracts above mentioned.

Plaintiff contends that there were unauthorized deductions by defendant from the proceeds of the deliveries made under these contracts. Plaintiff also contends that moneys, which should have been paid for the fruit delivered under these contracts, were wrongfully applied to the expense of maintaining a cannery and a cider or vinegar factory, and to the payment of interest. Plaintiff also asserts that there was a surplus of money withheld by defendant, which should have been paid to the grower members.

Paragraphs X, XI and XIV of plaintiff's complaint contain the gravamen of plaintiff's charges against defendant of wrongful deductions, failure to account for and pay to plaintiff the various amounts claimed by plaintiff to be due from defendant, and the alleged facts upon which plaintiff claims to be entitled to interest together with the amount of the interest so claimed. For this reason, we here set forth paragraphs X, XI and XIV of plaintiff's complaint as far as same reflect plaintiff's position in respect thereto:

"X

"Plaintiff alleges defendant has not accounted properly for the value or price or proceeds of the fruit delivered to it from Hood River Orchards Co. Property and that defendant used portions of the money so derived from the fruit off of Hood River Orchards Co.

Property and delivered to defendant for unauthorized purposes, and misused and diverted such funds to plaintiff's loss as hereinafter more specifically alleged.

"XI

"By virtue of the contract, Exhibit A * * * defendant was limited to the packing and storage and refrigeration and sale of fresh fruit only. Plaintiff alleges defendant without any authority or power or capacity so to do by its articles of incorporation or by valid by-laws properly and with authority adopted, or the marketing agreement and in violation of its duty in handling plaintiff's fruit and funds derived therefrom wrongfully used the fruit and fund derived from the fruit produced on Hood River Orchard Co. Property for the purpose of establishing and operating canning, cider and vinegar plants, including the purchase of land and buildings and machinery, supplies, and equipment and materials and operating the same since the year 1928, all to the loss and damage of plaintiff and the owners of Hood River Orchard Co. Property. Defendant wrongfully, and without any authority of power or capacity so to do, invested and spent in the canning business for the canning plant and equipment for canning and cider and vinegar business upwards of $381,563.61 and from the year 1928 to 1931, both inclusive, suffered an operating loss in the canning, cider and vinegar business of $121,786.37 [changed by interlined amendment at conclusion of trial to $150,000.00.] Furthermore, in the cannery and cider and vinegar operations an average period of six months elapses between the time of packing and the time of sale of the canned goods and cider and vinegar, during which time defendant paid interest on borrowed money to carry on such unauthorized canning and vinegar business, such interest being paid from money of the growers, including plaintiff, and the growers including plaintiff were thus deprived of the use of money which should have been and would otherwise have been derived from the prompt sale of the fresh fruit—sold as fresh fruit, to the damage of the growers including plaintiff in

the amount of $22,634.10 from 1928 to 1931 both inclusive; and that down to May 31, 1932 interest thereon accrued in the further amount of $1,563.15, or a total of $24,197.25 as of May 31, 1932. The growers were and are entitled to interest on said sum, which amounts to $4,355.51 additional down to May 31, 1935, or a total of accrued interest on costs of $28,552.76, all over the repeated objections of plaintiff.

"Furthermore, from 1928 to 1932, both inclusive, defendant accumulated a surplus of money belonging to the growers of fruit of more than $35,905.23, which money did not in truth and in fact belong at all to defendant but actually belonged to the growers and which should have been refunded to the growers but which was in fact diverted and held and retained by defendant for its own use and benefit, and interest thereon at the rate of 6% per annum down to May 31, 1935 is in excess of $6,462.94, or a total of accumulated surplus with interest down to May 31, 1935 of $42,368.17 to which plaintiff alleges the growers including plaintiff are entitled."

"XIV

"From the crops of 1923 to 1931, both inclusive, defendant deducted from the crops delivered to it off of the Hood River Orchard Co. Property in excess of $16,977.69 for building and equipment fund, and neither plaintiff nor plaintiff's companies have been members of defendant association since 1932 and such amount should be refunded to plaintiff with interest at the rate of 6% per annum from May 31, 1932."

The proportion, which plaintiff claims of the total sums alleged to have been withheld by defendant from all of its grower members is derived by determining the ratio existing between the total deliveries to defendant by all of its members and the amount of deliveries made by "the purchasers" and this ratio is alleged to be 3.0843 per cent.

Defendant urges that plaintiff has no right or capacity to bring this suit. Upon that point plaintiff's

complaint is vague and unsatisfactory. The contract is alleged to have terminated disclosing privity between plaintiff and the grower members of defendant who in turn contracted with defendant concerning the fruit in suit and who for brevity are termed "the purchasers".

Paragraph XVI of plaintiff's complaint is as follows:

## "XVI

"The said contract of January 8, 1923 with amendments thereof between plaintiff and his wife and Davidson Fruit Company as sellers and the said The Purchasers terminated prior to February 19, 1932 and on said date all of the papers and documents that had been lodged with Butler Banking Company in escrow including said contract of January 8, 1923, with amendments thereof, and the interest of the purchasers ceased and determined prior to February 19, 1932 or at that time and said The Purchasers never became the owners of said Hood River Orchards Co. Property."

This allegation is supported by a writing known to this record as plaintiff's exhibit V.

There is no allegation or proof of any other contract between plaintiff and "the purchasers", nor of the terms upon which the original contract was rescinded. There is no allegation or proof of a settlement between plaintiff and "the purchasers" whereby the amount alleged to be due from defendant would be considered either in whole or in part as the property of plaintiff. The only basis for plaintiff's right to the chose in action herein lies in said plaintiff's exhibit V and the clause in the vendors' contract hereinbelow quoted, which purports to declare effective certain provisions of said vendors' contract upon the termination of the same.

There is some evidence of unpaid portions of the expense of managing the orchard property, particularly a part of the superintendent's salary, which, under said vendors' contract between plaintiff and "the purchasers", may be deducted by "the purchasers" from the proceeds of the deliveries to defendant.

The original contract of sale between Davidson Fruit Company and plaintiff and his wife as sellers and "the purchasers" as buyers, the same being herein designated as the vendors' contract, contains the following provision:

"If any crops are harvested before the termination of this agreement, but are undisposed of, or are disposed of and the proceeds remain unaccounted for at the time of such termination, same shall be marketed and/or the proceeds thereof shall be accounted for and paid as hereinabove provided, as though no termination had occurred."

Among other things, the said contract of sale provides that the buyers may draw checks on funds coming into the hands of the escrow agent, for

"d. All charges and expenses for labor and material reasonably necessary for the performance of the covenants herein contained which are to be by the buyers performed, including reasonable and ordinary charges for manual labor actually performed by the buyers, including a superintendent's salary, which shall not exceed, however, $125 per month."

Despite the propriety of requiring "the purchasers" to be made parties hereto, we will discuss other phases of the case.

It is necessary to determine whether the terms and conditions of the members by-laws of defendant are to be deemed part of the contracts between "the purchasers" and defendant. In these marketing contracts

the representative of the parties, whom we designate as "the purchasers", is called the grower and defendant is designated as "the association". These marketing contracts contain the following paragraph:

"The Grower agrees to haul and pack his fruit in accordance with the methods and rules prescribed by the Association and to deliver the same free of expense to the Association at Hood River—(or if delivered to any other shipping point, freight and switching charges to Hood River to be borne by the Grower)—at such time as may be designated by the Association. *The grower further agrees to comply with and conform to all of the rules, regulations and requirements of the Association."* [Italics supplied.]

■■ We think that the final sentence in the above quoted paragraph of "the purchasers" contract with defendant expressly incorporates as part of said growers' contracts the pertinent provisions of the members by-laws of defendant. Moreover, we are unable to avoid the conclusion that all grower members, including the parties designated herein as "the purchasers", are bound by the provisions of the members by-laws of defendant by reason of their relationship to defendant as grower members.

■ At best, plaintiff is in the position of a successor in interest of "the purchasers" and hence is likewise bound not only by the terms of the contracts existing between "the purchasers" and defendant, but also by the terms and provisions of defendant's members by-laws.

The first specific charge against defendant is the alleged wrongful diversion "upwards of $381,563.61" "for the purpose of establishing and operating canning, cider and vinegar plants including the purchase of land and buildings and machinery, supplies and

equipment", and defendant thereby suffered an operating loss from the years 1928 to 1931, both inclusive, of $121,786.37.

On November 28, 1928, at a meeting of the board of directors of defendant a committee was appointed "to investigate the cannery from all angles and report to the board their findings." On February 18, 1929, a resolution was passed favoring the plan of the association (defendant) going into the canning business along the lines recommended in the report of the committee and general manager. One of "the purchasers" Mr. F. D. Nunamaker voted in favor of that resolution. On February 21, 1929, at a special meeting, by a rising vote the members and stockholders of defendant adopted a motion favoring the recommendation of the committee to the effect that the association go into the canning business. At that meeting the plaintiff was present and expressed himself as opposed to such proposal.

On March 9, 1929, at a special meeting, the members and stockholders of defendant voted in favor of a bond issue of $75,000 for the purpose of equipping and operating a fruit and berry cannery. The membership vote was: Yes, 202; No, 13. The income vote was: Yes, 12,181; No, 798.

On the 7th day of October, 1929, at a meeting of the board of directors, a motion was passed leaving the matter of the vinegar plant and plans for its operation with the manager of the canning committee to report back to the board as soon as possible.

On the 14th day of October, 1929, a tentative report was made by the cannery committee.

On the 16th day of October, 1929, a resolution was unanimously adopted to the effect that the defendant lease the plant of the Hood River Vinegar Company

up to July 31, 1930. Mr. F. D. Nunamaker, one of "the purchasers", voted in favor of said resolution.

On the 5th day of June, 1930, at a meeting of the board of directors of defendant a resolution was unanimously adopted authorizing the purchase by defendant of the Hood River vinegar plant.

The record discloses that, while the vinegar plant was operated under a lease, the defendant realized a profit. It is also shown that before the plant was purchased a careful investigation was made by and at the instance of the directors and expert advice was procured as to the advisability of making such purchase.

The members by-laws of defendant in section 7 thereof creates

"a permanent fund of an amount equal to from nothing to five cents per package per annum on all fruit handled by the Apple Growers Association, commencing with the fiscal year beginning June 1st, 1919, of the standard grades of fruit on which the Association's handling and marketing charges, at the time this amendment was adopted, were ten cents per package, and a pro rata amount on all packages of fruit on which the Association's handling and marketing charges were more or less than ten cents per package, at the time this amendment was adopted."

Said section 7 also provides:

"Said fund so created shall be known as the 'Building and Equipment Fund', and shall be kept separate and apart from all other funds and moneys of the Association and shall be used exclusively for the purchasing of or paying for property, equipment or betterments, for the benefit of the Members of the Association in handling and marketing their fruit, and no portion of said fund shall be paid out in any other manner or for any other purpose than as stated herein.

"The amount raised in any fiscal year for such 'Building and Equipment Fund' shall be in the dis-

cretion of the Board of Directors; provided, however, the amount raised for such Fund shall not exceed in any fiscal year an amount equal to five cents per standard package of the fruit handled by the Association during such fiscal year.''

It is true that defendant did not keep said Building and Equipment Fund separate and apart from other funds and moneys of the association, but it maintained a Building and Equipment Fund Account in its system of bookkeeping.

There is nothing in the record disclosing that any money, which should have been paid to the purchasers for the fruit in suit, was treated as belonging to the Building and Equipment Fund Account.

The argument is presented that defendant had no source of revenue except that which was derived from crop sales. This is answered by the obvious statement that defendant had its credit, sometimes used to the extent of $1,000,000; and defendant also had its Building and Equipment Fund. We are not able to follow defendant's argument that it is impossible for defendant to suffer loss. To us it is clear, when defendant embarks in the canning industry and the manufacture of cider and vinegar, borrowing several hundred thousands of dollars for that purpose, that depreciation in the value of its plants alone may cause substantial loss to the defendant. That such a loss may or may not be passed on to and assumed by its members is beside the point. To us it is clear that in such a contingency the defendant will have suffered a loss, even such a loss as to bring about a final liquidation; but we think that this question is not presented here. The question here is whether funds, which should have been credited to the purchasers, have been diverted to the

Building and Equipment account. The defendant markets the products of its members in pools. That means that all of a given kind of fruit received during a season is treated, handled and marketed separately from other kinds and varieties. There may be a pool, for instance of Gravenstein apples, another of Comice pears, etc.

There is some evidence tending to show that ordinarily in the usual course returns upon the respective pools are available to the members within six months, and it is argued that where, as in the case at bar, a longer time has elapsed, the delay may be attributed to the use of defendant's money in paying interest; but we think that in that respect we would be entering into the realm of conjecture if we held in accordance with such argument.

It appears that advances were made by defendant to the growers in larger sums than the market thereafter justified. It also appears that defendant had a large stock on hand of unsold fruit products. An adjustment of these two items would materially reduce if not entirely efface the alleged loss claimed by plaintiff to have been sustained by defendant in operating its cannery and its cider and vinegar plants.

To illustrate the matter of advances, defendant's witnesses testified to the effect that approximately 75 per cent of the estimated return was the amount of the usual advance. To enable defendant to make advances prior to receipts from sales, defendant would borrow from the bank and later, as proceeds from sales were received, in liquidating the pools, defendant withheld the amounts previously advanced. In 1929, defendant advanced $8 per ton to participating members on canning apples and from $10 to $50 per ton on canning pears dependent on grade.

These preseason estimates of returns were unjustified by the amounts actually realized and the result was that, when the pools were liquidated, the participating members owed the defendant instead of defendant owing them. As of May 31, 1931, these over advances to all canning pool participants, taking no account of inventory on hand, was $154,743.61. The estimated sales value of the unsold fruit and fruit products on hand May 31, 1931, amounted to $190,694.23, subject to deduction for selling and shipping expenses. It is obvious these two overlapping items in defendant's assets more than offset the amount alleged by plaintiff to comprise an operating loss.

The record discloses that preseason advances on cannery pools were made by defendant to plaintiff's vendees [whom we have repeatedly designated as "the purchasers"], in the amount of $6,600.70, while the actual returns therefrom were $5,882.03.

■ No good purpose can be served by a further discussion of this phase of the case except to say that plaintiff has not proved that any funds were wrongfully diverted in connection with the cannery and cider and vinegar factory.

■ The second item of plaintiff's claim of $42,368.17 consists of the sum of $35,905.23 and $6,462.94 alleged to have accrued as interest thereon. The principal sum is the balance to the credit of an "Earned Surplus" account on defendant's books. This surplus was derived from the sale of ice manufactured by defendant.

Section 3 of Article X of the Members By-laws of defendant contains the following provisions:

"When the pools are finally closed (but not previous to the end of the fiscal year, viz., May 31st) there shall be declared and paid to the Members of the Apple Growers Association entitled thereto, a refund out of

the surplus receipts of the Association, whenever and as often as such surplus receipts and the financial condition of the Association will warrant, such refunds shall be declared and paid from the surplus receipts of the following departments, viz:

\*   \*   \*   \*   \*

Second: From the surplus profits obtained from the purchase and sale of supplies and merchandise which shall be based on the pro rata amount contributed by each Member entitled to such refund through the purchase of supplies and merchandise since the last preceding refund.''

We are disinclined .to pass upon the question of the right of ''the purchasers'' to an offset because of any interest they may have in this item of surplus profits against the claim if any be made by the defendant because of the over preseason advances to ''the purchasers'' as above outlined; for it is plain that plaintiff has not shown such an interest therein as to justify an adjudication thereon. in this case to which ''the purchasers'' are not parties.

■ It is an admitted fact that defendant deducted from the proceeds of the fruit crops in suit, for the nine years involved, the total sum of $16,977.69 for its building and equipment fund. That is less than four cents upon each of the 435,114 packages delivered by ''the purchasers''. The members by-laws authorize a deduction of from ''nothing to five cents per package''. Plaintiff has no ground of recovery in that respect.

■ We have treated of the merits of this case upon the facts and find for defendant except upon the question of accounting to the grower members or their assigns for the net profits realized from the operation of the ice plant. The pleadings herein will not support affirmative relief in plaintiff's behalf on that phase

of the case. Aside from the necessity of making ''the purchasers'' parties, there is no allegation of the total amount of merchandise purchased during the operation of the ice plant nor of the amount contributed by ''the purchasers'' through the purchase of supplies and merchandise.

Under appropriate pleadings with necessary and proper parties, plaintiff may be able to present a good cause of suit thereon dependent upon the character of the contract existing between plaintiff and ''the purchasers'' subsequent to the termination of said vendors' contract and the state of ''the purchasers'' account with defendant.

■ Notwithstanding our discussion of the facts, we think that the rendition of statements each fiscal year to plaintiff and ''the purchasers'' and plaintiff's failure to object to or protest against such statements of account within a reasonable time thereafter constitute an account stated as to the transactions therein involved. The surplus derived from the sale of ice is not so involved.

Plaintiff vigorously insists that there has been no account stated between plaintiff and defendant, and in that respect places reliance upon the case of *Hood River Orchard Co. v. Stone*, 97 Or. 158 (191 P. 662), wherein it is stated:

''The defendants contend that the association has annually rendered final statements to the plaintiff, which have been accepted and approved, and that the plaintiff has acquiesced in the business methods followed by the association. Such statements, however, contain nothing more than the amount of sales of plaintiff's fruit, together with the sum which it has been paid. They do not include or in any manner refer to or specify the charges made for handling, storing, advertising, or packing. There is nothing in them from

which the plaintiff could determine the amount of such charges or of the surplus arising therefrom.''

In the case at bar the pool statements, that is, statements with respect to the various pools accompanied the duplicate ledger sheets.' The debits charged appear plainly upon the pool statements with respect to handling, advertising, storage, operating charges, and building and equipment fund. The evidence discloses that these pool statements and ledger sheets were rendered to plaintiff when the pools were closed and some of them were introduced by plaintiff as exhibits herein. This clearly distinguishes the case at bar from *Hood River Orchard Co. v. Stone*, supra.

The decree of the circuit court is affirmed without prejudice to appropriate proceedings affecting the question of the right of ''the purchasers'' and plaintiff to a refund from the surplus fund derived from the sale of ice.

RAND, J., and ROSSMAN, J., did not participate in this opinion.