[Civ. No. 2497.   Fourth Appellate District.—December 13, 1940.]

ROY C. BOGARDUS et al., Appellants, v. SANTA ANA WALNUT GROWERS ASSOCIATION (a Corporation), Defendant and Respondent; JOHN M. WYNE et al., Interveners and Respondents.

Charles D. Swanner and R. Y. Williams for Appellants.

Forgy, Reinhaus & Forgy and A. M. Bradley for Defendant and Respondent.

Harvey, Rimel & Harvey and Rutan, Mize & Kroese for Interveners and Respondents.

GRIFFIN, J.—This is an action for injunction and declaratory relief brought by the plaintiffs and appellants Roy C. Bogardus, Emanuel C. Martin and Stephen Griset, for themselves as individuals, and for the express benefit of all persons who are now members of Santa Ana Walnut Growers Association, a corporation, and were such during some por-

tion of the period between January 1, 1921, and January 1, 1936, against the respondent Santa Ana Walnut Growers Association, a corporation (for convenience hereinafter called the "local association"), for an injunction restraining respondent local association from paying to any person or persons, firm or corporation who has ceased to be a member of the local association, any of the moneys returned to the local association from the California Walnut Growers Association, a corporation, hereinafter called the "central association", out of the operating reserve fund of the latter association, and that the court declare that all the money which the local association has already received from the central association out of the "present operative reserve fund" is the money and property of the local association and that any and all persons, whether or not they have been members of the local association between January 1, 1921, and January 1, 1936, who have ceased to be members of the local association, have no right or title or interest in or to any of said moneys or any part thereof, and that no part thereof should be paid to any of them.

The respondent local association filed a general demurrer to the complaint. Thereafter, by permission of the court, John M. Wyne, W. J. Gould and J. C. Steffens, hereinafter called the interveners, for themselves as individuals and for the express benefit of all persons who were members of the local association during all or any portion of the time from January 1, 1921, to January 1, 1936, but who ceased to be members of the local association prior to April 3, 1939, filed a general and special demurrer to the complaint. They relied only upon the general demurrer at the hearing thereof.

Intervener H. & J. Mabury Company, a corporation, filed a general demurrer to the complaint. All demurrers to the complaint were argued together and upon being submitted the court made its order sustaining all of the demurrers to the complaint without leave to amend, and the judgment of the court dismissing the action as to the appellants herein was thereafter duly entered and this appeal resulted.

The complaint alleges that during all of the years from 1921 to 1939, inclusive, the central association was a nonprofit cooperative walnut marketing association, whose members consisted wholly and solely of numerous localized nonprofit cooperative walnut marketing associations throughout

California; that during all of said time one of the members of the central association was respondent local association, which was a nonprofit cooperative marketing association whose membership consisted of numerous walnut growers; that all of the interveners herein, and all persons represented by them, were members of respondent local association during all or some part of the time from the years 1921 to 1935 inclusive, and contributed their walnuts for marketing; that they all ceased to be members of respondent local association prior to April 3, 1939; that all of the appellants herein and all persons represented by them, were members of respondent local association during all or some part of the time from the years 1921 to 1935 inclusive, and contributed their walnuts for marketing and all such persons were still members in good standing on April 3, 1939, the date of this action was filed.

The working plan for the marketing of walnuts through these associations was as follows: Each year each local association member of central association, including respondent local association, would receive the walnut crops from their various grower members, would prepare them for market and deliver them to the central association. The central association, in turn, would receive the walnuts from the various local associations, grade them and market them through its sales organization.

From 1921 to 1935, the central association adopted the practice of appraising and estimating the probable gross proceeds which it would receive during each particular crop year for all walnuts which it would market and sell during said crop year, and from that estimate the central association deducted its estimated costs and expenses of operation and thereby arrived at an estimate of its probable net sales proceeds for the particular crop year. Then, before all of the walnuts for said crop year were sold, the central association would advance to its local association members their *pro rata* share of the estimated net proceeds for that particular crop year. From the amount so received each local association would deduct its actual costs and expenses of operation. The resulting balance would then be distributed by the local association to its grower members *pro rata,* according to the amount of their respective contributions of walnuts. This practice was followed by the central association, by the local

association, and by the grower members of the local association during the entire period from 1921 to 1935 inclusive.

The complaint further alleges that the net proceeds, surpluses or excesses received by the central association were from year to year retained by the central association and placed in a separate special fund known as the "Present Operative Reserve Fund". The amount of net proceeds or surpluses which went into that fund during each year of the period above mentioned, and the amount of the net proceeds or losses suffered in the years 1926 and 1933 are specifically set forth and alleged in the complaint. It is further alleged that at the close of the central association's 1935–1936 fiscal year, the total net amount of proceed-surpluses in the "Present Operative Reserve Fund" after deducting the losses sustained in the years 1926 and 1933, was the sum of $697,479.70.

It is further alleged that respondent local association was and is entitled to receive from the central association a *pro rata* share of the total net amount of the proceed-surpluses which made up the "Present Operative Reserve Fund". The complaint then alleges in figures the amounts of the net proceed-surpluses which the respondent local association was and is entitled to receive for each of the crop years in which surpluses were realized and the amounts of the net proceed-losses which the respondent local association was required to bear for the two years when losses were sustained. Then it is alleged that after deducting the respondent local association's share of the losses from its share of the surpluses, a net surplus balance remained in the sum of approximately $42,717.08, which sum of money the respondent local association was entitled to receive from the central association out of the "Present Operative Reserve Fund", as its *pro rata* share of the total net proceed-surpluses derived from the sale of walnuts. It is then alleged that about November 12, 1936, the central and local associations entered into a written agreement wherein it was agreed that the local association's *pro rata* share of the net balance in the "Present Operative Reserve Fund" was $42,717.08, and that that sum would be paid to respondent local association in five equal annual installments of approximately $8,543.41 each. A copy of the agreement was attached to the complaint and incorporated therein. It is next alleged that at the time of filing the complaint the central association had already paid three yearly

installments of $8,543.41 each to the local association under the terms of the agreement. Then follows an allegation that all the debts, costs and expenses incurred by the local association for the years 1921 to 1935 inclusive for maintenance and for receiving, packing, processing, advertising and for all other expenses of marketing, were fully paid and discharged by the local association prior to the execution of the written agreement above mentioned, and that all of the debts, costs and expenses were paid and, discharged out of the money which the local association had from year to year received from the central association by way of advancement on account of crop proceeds as hereinabove set forth. The complaint then sets forth *in haec verba* portions of the by-laws of the local association which were in effect during the whole of the period in question.

Article X (a) thereof provides that the local association shall not have capital stock, *and that its business shall not be carried on at a profit, but all profits or losses realized or suffered by it in marketing the walnuts for its members shall be distributed to or borne by the persons delivering their walnuts to the local association for marketing,* upon such terms and conditions as prescribed in the by-laws or in any further contracts to be entered into by the respondent local association with its members. Other articles provide for the admission of new members and the issuance of membership certificates. Article X (e) provides that if any member of the local association *ceases to be a grower of walnuts and for that reason ceases to market walnuts through the association, then his membership shall, ipso facto, cease and be canceled;* and such member shall not be entitled to any appraisement of, or *further interest in,* the *property* of the association, other than the interest given him under the by-laws relating to "Revolving Fund", and each member expressly waives his right to said property, other than his interest in the "Revolving Fund", upon the cancellation of his membership. Other articles authorize the creation of the local association's revolving fund, provide rules for the use thereof, and fix the rights of the members in the revolving fund. The complaint then alleges that on March 1, 1925, a written marketing contract called "Growers' Contract" was entered into between all grower members and the local association wherein the contracting parties agreed upon all matters respecting the marketing of walnuts and

distribution of the proceeds from the sales. thereof. This contract was to continue in force until March 4, 1940. Among its provisions is one in reference to the right of growers to withdraw from the association. " . . . this agreement shall, as to the party withdrawing therefrom, *be terminated* and ended as of said March 1st, *as to the obligation* of said party *to buy and/or to sell* said walnuts". " . . . nothing in this paragraph shall impair or take away any of the rights of either or any of the parties hereto against any other party hereto existing at the time of such termination or withdrawal, except as to the delivery of walnuts produced after March 1st following, . . . " Other provisions are: "(b) LOCAL agrees to resell such walnuts, . . . and to *pay over the net amount* received therefrom as payment in full *to the GROWERS*, . . . " " . . . (a) *PROCEEDS* of resales of walnuts made by LOCAL shall be *distributed to growers* from time to time and as rapidly as Local *receives* the same from Central . . . Each GROWER expressly ratifies, confirms, and adopts the by-laws of Local . . . " (All italics ours.)

A similar agreement, called the "Central-Local Agreement", was executed between the local and the central associations. Among its provisions is to be found: "(a) CENTRAL agrees to buy . . . from each Local, and each Local agrees to sell . . . all of the walnuts . . . acquired . . . by such Local . . . (b) Central agrees to resell said walnuts . . . and to pay over the net proceeds received therefrom as payment in full to Locals . . . (a) Proceeds of resales of walnuts made by Central shall be distributed to Locals from time to time. . . . " The complaint then alleges that the interveners signed and subscribed to the by-laws of the local association; that on February 15, 1939, the board of directors of that association adopted a resolution, a copy of which is attached to the complaint, directing that all moneys received by respondent local association from the central association out of the aforesaid "Present Operative Reserve Fund" be immediately paid and distributed by the association *pro rata* to the persons who contributed to said fund from time to time by marketing their walnuts, in the proportion in which they contributed, whether or not such persons were then still members of the local association.

The complaint further alleges as a conclusion of law, that under the by-laws of the local association, the ex-members of

that association are not entitled to share *pro rata,* or at all, in any of the moneys received by the local association from said fund.

With this comparatively brief statement of the very lengthy complaint, we come now to the contentions of the respective parties.

Appellant first argues that under the terms of the by-laws of the local association and the general laws relative to a voluntary withdrawal by a member from a non-profit marketing association (sec. 602, Civ. Code) any member who voluntarily withdrew from respondent local association thereby lost all right to share or participate in the property of the association, such as the packing house fixtures, equipment and other items of tangible personal property in which title always moves with those members who retain their membership in the association.

Interveners admit that under article X (e) of the by-laws and section 602 of the Civil Code a member who voluntarily withdraws from the association loses his right in the *property of the association* other than his rights created by his interest in the revolving fund, but denies that the money here in controversy constitutes an asset or property of the local association and therefore does not come within the purview of nor is it governed by the terms and provisions of article X (e) of the by-laws or the general laws on forfeiture of rights in the physical properties and assets of the local association.

It is contended by the interveners that the moneys in controversy are not assets or property of the respondent local association but are the unpaid balances of crop proceeds received from the sale of walnuts during the years from 1921 to 1935, and that said moneys belong to the individual growers who contributed their walnuts for marketing during that period of time and that each such grower is entitled to receive his *pro rata* share of the moneys received from such crop proceeds, according to the proportion of his contribution of walnuts, whether or not he retained his membership in the local association.

Respondents point out that the local association first is a nonprofit cooperative walnut marketing association and cite chapter 4, section 1192 of the Agricultural Code, which provides as follows:

"ASSOCIATIONS DEEMED 'NONPROFIT'. Associations organized hereunder shall be deemed 'nonprofit', inasmuch as they are not organized to make profit for themselves, as such, or for their members, as such, but only for their members as producers."

Article X (a) of the by-laws of the local association contains the provision:

"This association shall not have a capital stock, and its business shall not be carried on for profit, but all profit or losses realized or suffered by it in marketing the walnuts for its members *shall be distributed to* or *borne by the persons delivering their walnuts* to the association for marketing, . . ."

Appellants do not dispute the fact that the sums herein involved are the net proceeds derived from the sale of walnuts delivered by the growers of the local association for the crop years mentioned. The local association held this money in a separate fund and added to it in the same manner from year to year until the fund was closed at the end of 1935. Under the installment plan agreed upon respondent local association will have in its possession $42,717.08 which it never had before and for which no consideration has been given by respondent local association, as an association. To allow respondent local association to retain this money for the benefit of the association, as such, or for the benefit of its present members, as such, would result in permitting it to enjoy a profit for itself, as such, or for its members, as such, in contravention of the very purpose for which it was organized, and would result in permitting present members to enjoy the use and benefit of such money, not as producers of walnuts, but simply as members of respondent local association, to the total loss and detriment of the ex-members. Appellants admit the results above suggested but contend that the same rule applies to this money as to the general property of the local association.

In this connection it should be noted that under the terms of the by-laws relating to the revolving fund, that fund is to be used to purchase, operate and maintain all of the physical assets and property of the respondent local association. Thus, a withdrawing member's interest in the revolving fund represents his interest in the property of the association, and he ultimately receives back what he has put into this fund, but he is not entitled to receive back any sum of money in ex-

cess of his actual contribution thereto. If we were to adopt the appellants' construction of the by-laws as to the moneys here in controversy, the withdrawing member, who contributed thereto, would lose all rights to the funds in question if the local association were permitted to retain said moneys. Under the by-laws we do not believe this result was intended.

Appellants also contend that the marketing contracts which were entered into are, by their terms, contracts of absolute and outright sale and purchase, and that by reason thereof, there is no fiduciary relationship existing between the parties thereto.

It is respondents' contention, with which we agree, that at all times the relationship between the grower member and the local association, and between the local association and the central association, was that of principal and agent, or beneficiary and trustee; that a fiduciary relationship existed which required at all times that these associations account to the grower member for all proceeds received from the sale of walnuts, and required the grower member to bear his proportionate share of all losses sustained in the marketing and sale of walnut products. In support of this contention *Texas Certified Cottonseed Breeders' Assn.* v. *Aldridge,* 122 Tex. 464 [61 S. W. (2d) 79], and *Rhodes* v. *Little Falls Dairy Co., Inc.,* 230 App. Div. 571 [245 N. Y. Supp. 432], are cited. Both of these cases involve actions between a member of a nonprofit cooperative marketing association and said association for an accounting, and for the determination of rights involving proceeds received from sales of marketed products. In each of these two cases marketing contracts had been entered into between the purchaser and association, which contracts provided for the immediate passage of title and were otherwise couched in terms of outright purchase and sale. In each of the cases cited the court held that the provisions for passage of title, and the terms of purchase and sale, were merely for convenience in marketing operations, and that the real relationship between the parties was one of trust, or of a fiduciary character. Appellants cite several cases which reach a contrary conclusion and hold that the contracts under consideration were agreements for outright sale and purchase and that no fiduciary relationship existed. (*McCauley* v. *Arkansas Rice Growers' Co-Op. Assn.,* 171 Ark. 1155 [287 S. W. 419], *Winter Garden*

*Citrus Growers' Assn.* v. *Willits,* 113 Fla. 131 [151 So. 509], Fletcher Cyclopedia Corporations, vol. 16, sec. 8286, p. 1205, *Callaway* v. *Farmers' Union Co-Op. Assn. etc.,* 119 Neb. 1 [226 N. W. 802], and *Texas Farm Bureau Cotton Assn.* v. *Lennox,* 117 Tex. 94 [297 S. W. 743].)

Respondents claim to have made an exhaustive examination of the California law and are unable to find any cases directly deciding this point. Our attention, however, has been called to the case of *Mountain View Walnut Growers' Assn.* v. *California Walnut Growers' Assn.,* 19 Cal. App. (2d) 227 [65 Pac. (2d) 80], which was an action between one of the members of a local association and the California Walnut Growers' Association, and involved a controversy regarding a similar fund of money to that which is here in controversy, viz., the "Present Operative Reserve Fund". One of the same forms of marketing contracts, i. e., a "Central-Local Agreement", such as the one here involved, was also there under consideration. The local association in that action was seeking the return of its *pro rata* share of the "Present Operative Reserve Fund" and at the time that action was instituted and heard no agreement had been entered into between the central association and its local association members for the distribution of that fund, and the central association was still holding that fund in its possession. Although the court there held that the local association's action was premature, it did hold that the "Present Operative Reserve Fund" was not the property of the central association, but was, as agreed upon by the parties, a trust fund, and that the local association was entitled to its *pro rata* share of the money when the funds should be distributed. It becomes apparent then that the decision does constitute and hold that the "Central-Local Agreement", which is the same in substance as the one here involved, was not a contract of outright purchase and sale, because if it had so held, then it would have been incumbent upon the court to have said that when from year to year the central association advanced moneys to the local association on account of crop proceeds, under the terminology of the agreement, the local association was paid in full. ▪ We are therefore convinced that if the money here in controversy was a trust fund while it was in the hands of the central association, then it clearly is a trust fund while in the hands of the local association and that each member who con-

tributed to that fund is entitled to receive his *pro rata* share thereof. It therefore appears to us that under the rule here adopted, the ultimate and final benefits should be distributed to those persons who contributed their walnuts in proportion to their contribution. Not only is this rule a fair and equitable one and in harmony with the non-profit cooperative character of these associations, but it is a rule which was contemplated by the parties to this action as shown by the following excerpts from the by-laws of the respondent local association and from the marketing contracts here involved. Article X (a) provides that the local association's business shall not be carried on for profit, but that the profits realized by it in the marketing of its members' walnuts shall be *distributed to the persons delivering their walnuts* to the association. Section VI (b) of the Growers' Contract contains this provision:

"If Local, . . . shall advance . . . to Growers . . . more than the amount to which said growers are . . . entitled . . . grower . . . agrees . . . to . . . repay . . . to Local so that said grower shall receive neither more nor less than the amount to which he is entitled."

The Central-Local Agreement contains an identical provision with reference to overpayment to the local association. This clearly indicates that it was the intention of the parties that each contributing member of respondent local association was ultimately to receive the entire net proceeds from the sale of his walnuts, and that no one payment, or advancement, was to be considered as final, or payment in full, if, in fact, later developments should disclose that the net proceeds from the sales of his crops were greater or less than the amount so advanced to him.

Section III (c) of the Growers' Contract provides for the termination of, or a member's withdrawal from said marketing contract and then provides that *nothing in said paragraph shall impair or take away any of the rights of either or any of the parties to said agreement against the other parties existing at the time of such termination or withdrawal.* It therefore appears that there is no authority under the marketing contract or by-laws of respondent local association which would permit that association now, for the first time, to elect to retain this money, which represents crop proceeds from past years, as a reserve or other fund for future operations,

especially where a portion of that money constitutes the balance of net proceeds received from walnuts contributed from persons who no longer are members of the local association and who could receive no benefit from such a reserve or other fund. We therefore conclude that the rule of forfeiture established by the by-laws and by the general laws that a member who voluntarily withdraws from a nonprofit cooperative marketing association loses his right to an interest in association property, other than his interest in the association's revolving fund, applies only to the property or assets of the association, and has no application to unpaid and undistributed crop proceeds money received from the sale of walnuts contributed by the withdrawing member to that association for marketing, prior to the date of his withdrawal, and the balance of crop proceeds money is the property of the person who contributes his crop. (*Hood River Orchard Co.* v. *Stone,* 97 Or. 158 [191 Pac. 662]; *Ozona Citrus Growers' Assn.* v. *McLean,* 122 Fla. 188 [165 So. 625]; *Buford* v. *Florian Fruit Growers' Assn.,* 210 Cal. 84 [291 Pac. 170] (citing *Hood River Orchard Co.* v. *Stone, supra*); *Loomis Fruit Growers' Assn.* v. *California Fruit Exchange,* 128 Cal. App. 265 [16 Pac. (2d) 1040].) In the last-cited case the court said, at page 280:

"The Buford case need not be considered further than simply supporting what we have said, that the withholdings made by the Exchange were of moneys belonging to the Association and to the growers marketing fruit through the Exchange."

■ Both under the facts alleged in the complaint and under the law applicable thereto, the moneys in controversy constitute the balance of net proceeds received from the sale of walnuts contributed to the local association for marketing during the years from 1921 to 1935 inclusive, and as such, are the property of, and belong to those persons who contributed their walnuts for marketing during that period. It is therefore apparent that the complaint does not state facts sufficient to constitute a cause of action and that the rulings upon the demurrers were proper.

■ This appeal is taken by appellants from an amended judgment of dismissal, dismissing "the action brought" by them. Respondent local association contended that the dismissal of appellants' action operated as a dismissal of and

terminated the action as to all parties, including the interveners, citing *Henry* v. *Vineland Irr. Dist.*, 140 Cal. 376 [73 Pac. 1061]. Upon motion of interveners for diminution of the record they represented that they filed in the superior court, with its consent, a complaint and an amendment to the complaint in intervention, seeking relief against the respondent local association herein, in addition to joining with said respondent in contesting the claims of appellants.

For the purpose of examining the allegations bearing upon this point, the motion for diminution of the record should be granted only as to the complaint in intervention and the amendment thereto. (Rule XIV, Rules for the Supreme Court and District Courts of Appeal.) The additional relief sought therein consists briefly in asking for an adjudication as to the ownership of the fund in question, an adjudication as to the portions thereof belonging to the several interveners, an order for the payment thereof to the said interveners, and an adjudication and award by the court of a reasonable amount as attorneys' fees and costs, to be paid out of such fund as may be recovered by such interveners for themselves and the class they represent. It is apparent therefrom that the aforesaid matters raised by the complaint in intervention, as amended, are still pending in the trial court and await trial and decision by that court. We are unable to construe the order from which the appeal was taken as a dismissal of any cause of action other than appellants'. The issues presented by interveners' complaint in intervention should be determined by the trial court.

The motion for diminution of the record only as to the complaint in intervention and the amendment thereto is granted. The judgment of dismissal of appellants' cause of action is affirmed.

Barnard, P. J., and Marks, J., concurred.

Petitions by appellants and respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, were denied by the Supreme Court on February 10, 1941.