**SAN JOAQUIN VALLEY POULTRY PRO-DUCERS' ASS'N v. COMMISSIONER OF INTERNAL REVENUE.**

No. 10246.

Circuit Court of Appeals, Ninth Circuit.

June 5, 1943.

Milton D. Sapiro, of San Francisco, Cal., for petitioner.

Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key, A. F. Prescott, N. Barr Miller, and Loring W. Post, Sp. Assts. to Atty. Gen., and W. Glenn Harmon, J. Edward Johnson, and William H. Henderson, all of San Francisco, Cal., for Wayne E. Mayhew and Herman G. Brissman, certified public accountants, amicus curiae.

Eugene L. Hensel, of Columbus, Ohio, for National Council of Farmer Cooperatives, amicus curiae.

Before MATHEWS, HANEY, and HEALY, Circuit Judges.

MATHEWS, Circuit Judge.

Here for review is a decision of the Board of Tax Appeals [1] which sustained a determination by respondent, the Commissioner of Internal Revenue, that there were deficiencies in respect of petitioner's income taxes for 1936 and 1937. The determination resulted from respondent's inclusion of three sums ($1,683.56, $2,215.29 and $5,722.72) in computing petitioner's net income for 1936 and his inclusion of two sums ($2,601.90 and $5,358.46) in computing petitioner's net income for 1937. The question is whether or not these sums— the $1,683.56, the $2,215.29, the $5,722.72, the $2,601.90 and the $5,358.46—were income of petitioner.

Petitioner is a nonprofit cooperative association. It was organized (incorporated) in 1925 under title 23 (§§ 653aa–653yy) of part 4 of division 1 of the Civil Code of California. Sections 653bb, 653cc and 653ff–653yy of the Civil Code were repealed in 1933 and were superseded by chapter 4 (§§ 1191–1221) of the Agricultural Code of California.[2] Section 1217 of the Agricultural Code provides: "Any corporation or association organized [as petitioner was] under previously existing statutes for the purpose of cooperatively marketing products as defined in this chapter [3] shall be deemed organized and existing under and by virtue of the terms of this chapter, and all of the provisions of the terms of this chapter, and any of the restrictions and benefits thereof shall apply in all of their terms to such corporation."

Section 1192 of the Agricultural Code provides: "Associations organized [under chapter 4] shall be deemed 'nonprofit,' inasmuch as they are not organized to make profit for themselves, as such, or for their members, as such, but only for their members as producers."

Section 1194 provides that each association organized under chapter 4 may engage in any activity in connection with the marketing, selling, preserving, harvesting, drying, processing, manufacturing, canning, packing, grading, storing, handling or utilization of any products produced or delivered to it by its members or any activity in connection with the purchase, hiring or use by its members of supplies, machinery or equipment; act as the agent or representative of any member or members in any of the above mentioned activities; borrow money; establish reserves; levy assessments; and use or employ any of its facilities for any purpose, "provided the proceeds arising from such use and employment shall go to reduce the cost of operation for its members; and provided, further, that the products of nonmembers shall not be dealt in to an amount greater in value than such as are handled by it for its members."

Petitioner's articles of incorporation [4] state that it is formed to engage in any activity in connection with the marketing,

---

[1] Now called the Tax Court of the United States.

[2] Stats. 1933, pp. 60, 255–264, 294–298.

[3] Section 1191 of the Agricultural Code defines "products" as including "horticultural, viticultural, forestry, dairy, live stock, poultry, bee and any farm products."

[4] Section 1196 of the Agricultural Code provides that the articles of incorporation of any association organized under chapter 4 shall state, inter alia, the purposes for which it is formed.

384

selling, packing, grading, storing, handling or utilization of any poultry eggs or other agricultural products produced or delivered to it by its members, or any activity in connection with the purchase, hiring or use by its members of supplies, machinery or equipment. The articles provide that petitioner "shall conduct and carry on its business without profit to itself."

Petitioner's by-laws [5] state that its purpose "is to provide for its members a collective system of marketing poultry, poultry products and other agricultural products, to furnish to them any feed, seed or supplies and, to the end of lessening the cost of such service, to do the same things for those who are not members;" that it "is organized as a nonprofit cooperative organization;" and that "The 'net proceeds' resulting from the operation of the business, if any, shall belong to the members." The by-laws provide: "The Association [petitioner] does and shall consist of poultrymen and other agricultural producers who shall have been duly elected and shall have paid the membership fee of Ten ($10.00) Dollars. * * * The membership fee * * * must be paid in cash at the time application for membership is made. * * * All moneys received from membership fees shall constitute the membership fund, which fund shall not be reduced except when returned to members upon withdrawal or loss of membership as provided in these by-laws; it may, however, be invested in lands, buildings or equipment necessary for the operation of the business of the Association, or it may be used as working capital of the Association * * *."

Petitioner's directors [6] were authorized to establish reserves [7] and did establish three—one called reserve for overpayment,[8] one called reserve for security of the membership fund [9] and one called reserve for zoning hazard.[10] All moneys placed in these reserves were taken from, and constituted part of, the "net proceeds" resulting from the operation of petitioner's business.

Petitioner engaged in the business of marketing eggs for its members and selling supplies to its members and others. It did not pay its members the entire net proceeds of the eggs which it marketed for them in 1936, but retained $1,683.56 thereof—the $1,683.56 hereinabove mentioned—and placed this sum in its reserve for overpayments. It did not sell supplies to its members or other customers at cost, but sold them at prices which included cost, plus "overcharges" sufficient to cover expenses and leave a balance which the by-laws speak of as "net proceeds." [11] It refunded part of the "net proceeds" to its customers (members and nonmembers) and retained the balance. The balance so retained in 1936 included the $2,215.29 and the $5,722.72 hereinabove mentioned. The balance so retained in 1937 included the $2,601.90 and the $5,358.46 hereinabove

---

[5] Section 1200 of the Agricultural Code provides that each association shall adopt, for its government and management, a code of by-laws not inconsistent with chapter 4.

[6] Section 1201 of the Agricultural Code provides that the affairs of the association shall be managed by a board of not less than three directors. Petitioner has seven directors.

[7] Agricultural Code, § 1194, supra.

[8] To protect petitioner against overpayment of egg sale proceeds to its members. As found by the Board: "The returns from the marketing of eggs was uncertain. When the petitioner paid its members for eggs still unmarketed and at prices then quoted on the market, it ran the risk that it would not realize as much when the eggs were sold by it. Uncertainty in estimating expenses was also involved. This reserve was intended to protect the petitioner against both these risks."

[9] This, the Board found, was to protect petitioner against diminution of its working capital "by a too sudden reduction in membership."

[10] To protect petitioner against the possibility that the City of Porterville, where petitioner had its office, warehouse and feed mill, might enact a zoning ordinance which would necessitate removal to another part of the city or to a point outside the city.

[11] The by-laws provide: "The 'net proceeds' shall be such funds as are derived from overcharges on sales and as are left after all expenses shall have been paid, or provided for, all at the discretion of the directors. The 'net proceeds' resulting from the operation of the business, if any, shall belong to the members and shall be known as 'members' purchase credits' and shall be prorated to them in proportion to the amount of business each member has transacted with [petitioner] during the time such 'members' purchase credits' have accumulated."

mentioned. Petitioner placed the $2,215.29 and the $2,601.90 in its reserve for security of the membership fund and placed the $5,722.72 and the $5,358.46 in its reserve for zoning hazard.

The sums so placed in these reserves— the $1,683.56, the $2,215.29, the $5,722.72, the $2,601.90 and the $5,358.46—never became the property of petitioner, but were and are the property of the members. Bogardus v. Santa Ana Walnut Growers Ass'n, 41 Cal.App.2d 939, 946–949, 108 P.2d 52, 56–58. See, also, Mountain View Walnut Growers Ass'n v. California Walnut Growers Ass'n, 19 Cal.App.2d 227, 65 P.2d 80; Reinert v. California Almond Growers Exchange, 9 Cal.2d 181, 70 P.2d 190. To hold otherwise would be to hold that petitioner could and did "make a profit for itself, as such," in contravention of its by-laws, its articles of incorporation and the statute to which it owes its existence. Bogardus v. Santa Ana Walnut Growers Ass'n, supra.

Petitioner never pretended to be the owner of these sums, but, as required by its by-laws,[12] "prorated" and credited them to its members. The fact that the sums were not payable to the members on demand, or at any fixed time, does not alter the fact that they were their property and not petitioner's. Petitioner held them, not as owner, but as agent or trustee for the members. Bogardus v. Santa Ana Walnut Growers Ass'n, supra. Since none of the sums ever belonged to petitioner, they could not be, and were not, income of petitioner.

In support of his contention that the sums in question were income of petitioner, respondent cites Fruit Growers' Supply Co. v. Commissioner, 9 Cir., 56 F.2d 90; Cooperative Oil Ass'n v. Commissioner, 9 Cir., 115 F.2d 666; Farmers' Union Co-op. Co. v. Commissioner, 8 Cir., 90 F.2d 488; Farmers' Union Co-op. Supply Co. v. United States, 25 F.Supp. 93, 87 Ct.Cl. 174; Callaway v. Farmers' Union Co-op. Ass'n, 119 Neb. 1, 226 N.W. 802. None of these cases involved a nonprofit cooperative association organized under chapter 4 of the Agricultural Code of California. Fruit Growers' Supply Company was not a nonprofit cooperative association, but was an ordinary California corporation. Cooperative Oil Company was an Idaho corporation. Farmers Union Cooperative Company, Farmers Union Cooperative Supply Company and Farmers Union Cooperative Association were Nebraska corporations. These cases are not in point. Petitioner is a California corporation and transacted all its business in California. Hence, in determining whether moneys it received were its property or the property of its members, the applicable law is that of California. Poe v. Seaborn, 282 U.S. 101, 110–113, 51 S.Ct. 58, 75 L.Ed. 239; Blair v. Commissioner, 300 U.S. 5, 9, 10, 57 S.Ct. 330, 81 L.Ed. 465; Lang v. Commissioner, 304 U.S. 264, 267, 58 S.Ct. 880, 82 L.Ed. 1331, 118 A.L.R. 319; Helvering v. Fuller, 310 U.S. 69, 74, 75, 60 S.Ct. 784, 84 L.Ed. 1082.

Decision reversed.