California Pine Box Distributors v. Commissioner.
California Pine Box Distribs. v. Commissioner
Docket No. 111763.
United States Tax Court
1943 Tax Ct. Memo LEXIS 172; 2 T.C.M. (CCH) 537; T.C.M. (RIA) 43365; July 29, 1943
*172 Arthur H. Kent, Esq., 1720 Mills Tower, San Francisco, Calif., for the petitioner. Samuel Taylor, Esq., for the respondent. SMITH Memorandum Findings of Fact and Opinion SMITH, Judge: The respondent has determined deficiencies of $23,055.81 in income tax and $7,599.50 in excess profits tax for the fiscal year ended November 30, 1938, and deficiencies of $12,304.31 in income tax and $4,874.95 in excess profits tax for the fiscal year ended November 30, 1939. The deficiencies result entirely from the inclusion in taxable income of amounts which petitioner set aside for reserves during the taxable years out of its sales of products furnished by its members under a cooperative marketing agreement. Findings of Fact Petitioner is a California corporation with its principal place of business located at San Francisco, California. It filed its returns for the taxable years involved with the collector for the northern district of California. The returns were made upon the accrual basis and for a fiscal year ending November 30. Petitioner was organized under the laws of the State of California in 1917 as a nonprofit cooperative corporation to act as a selling agent for a group of manufacturers *173 of "shook," a lumber product used in making packing boxes for vegetables, fruit, and other commodities. Petitioner's articles of incorporation provide, in part, as follows: Second: That the purposes for which such corporation is formed are: To operate as a selling agent for the purpose of marketing the products of its members and to turn back to them the proceeds of sales, less the necessary selling expenses, upon the basis of the quantity of the produce furnished by them, and in connection therewith: To buy or otherwise acquire, own, hold and keep, and to sell, mortgage, pledge, exchange or otherwise dispose of and to deal in, box shook and boxes of all kinds and other materials of all kinds in any way connected with box shook or boxes, or the manufacture, sale or other disposition thereof. Petitioner conducted its business under a written contract with the lumber companies, referred to as its members, which prescribed in detail the rights, duties, and obligations of the parties. The contract in force during the taxable years involved was executed by petitioner and nine member companies on December 1, 1936, for a term of three years. Under the provisions of that contract each *174 of the member companies furnished and delivered to the petitioner a specified quantity of shook during each year, for which petitioner paid them a preliminary billing price based on the general average selling price of each commodity (there are different types of shook for different uses) less a deduction of 10 percent of such selling price. The preliminary billing price was paid during the month following delivery of the shook either in cash, with a two percent discount, or, at the option of petitioner, with bills of exchange payable not later than the 15th of the fourth month following delivery and bearing interest, after 60 days, at the rate of one-half of one percent a month. Petitioner's transactions in each commodity were kept separately and the profits and losses from each commodity were distributed to the members annually in proportion to the quantities furnished by each of them during that period. The distributable profits and losses constituted the difference between (1) the aggregate amount of the preliminary billing price for such commodity for the period involved, and (2) the net amount realized by the petitioner on the sales of each commodity, that is, the gross amount *175 realized less freight and wholesalers' commissions, less two percent thereof which was withheld for "bad debt losses," less eight percent for operating expenses. If the account of any member in any particular product showed a debit balance for the accounting period the amount thereof was paid to petitioner in cash by the member on petitioner's demand. If, on the other hand, the account showed a credit balance petitioner paid the amount thereof to the member, either in cash or interest-bearing promissory notes. A preliminary settlement with each member was made at the close of the annual accounting period and a final settlement was made on all of petitioner's accounts in the particular commodity furnished by the member during that period. The two percent discount referred to above was set up on petitioner's books as a "bad debt reserve" to provide for uncollectible accounts and other bad debts. The eight percent which petitioner withheld for operating expenses was based upon the long established practice in the lumber industry of allowing eight percent as a fair commission to wholesalers and distributors of lumber products. If and when either the bad debt reserve or the reserve for *176 operating expenses proved inadequate petitioner assessed the members for the deficiency on the basis of their participation in its operations for the period. If, on the other hand, the reserve appeared to be larger than necessary the excess was distributed or repaid to the members during or at the close of the taxable period. The balance in petitioner's bad debt reserve at the beginning of the year 1938 was $163,611.70 and at the close of the year was $235,883.13. At the close of the year 1939 the balance was $227,664.61. Petitioner's accounts and notes receivable amounted at November 30, 1938, to $444,353.90 and at November 30, 1939, to $440,650.22. There was credited to the bad debt reserve $79,030.75 in 1938 and $66,114.29 in 1939. Bad debts were written off on 1930-1939 accounts of $4,068.73 in 1938 and $54,148.28 in 1939. Petitioner's net sales for the years 1935 to 1939, inclusive, amounted to approximately sixteen and one-half million dollars. During that period approximately $321,000 of bad debts were written off. Petitioner had an agreement with several large fruit companies to furnish them shook at a discount of one dollar per thousand under the market price. The fruit *177 companies in turn distributed the shook to the various small growers whose products they marketed. Petitioner billed the shook to the fruit companies at the standard price and credited them with the agreed discount. It set up on its books an additional reserve to offset the discounts which were to be paid or credited to the fruit companies after the close of the taxable year, on sales made during the year, so that the payment of the discounts would be borne by the participating members at the time of the sales and not by any new members who might later come into the group. Petitioner credited $3,048.43 to that reserve in 1938 and $3,520.19 in 1939. In its returns for 1938 and 1939 petitioner claimed the deduction of all of the amounts credited to both the bad debt reserve and the reserve for future discounts. The respondent disallowed the additions to the bad debt reserve in each year on the ground that the reserve was sufficient to absorb all probable bad debt losses of those years. He also denied the deduction of the amounts credited to the reserve for discounts for the reason that the liability for such discounts was contingent at the close of the taxable years. Petitioner reported *178 no gain or loss from its membership business in either of the taxable years. It reported a gain of $2,109.15 in 1938 and a loss of $731.29 in 1939 from nonmember business. In his audit of the returns, as shown by the deficiency notice, the respondent reversed both of these items on the grounds that the nonmember business was only incidental to petitioner's "cooperative" business and that the resulting gains and losses were properly apportioned among the members. Opinion The petitioner alleges in its petition that the respondent erred in determining that the amounts deducted in each year as additions to its reserves for bad debts and for discounts were not reasonable additions to such reserves. It contends in its brief that: By virtue of the relations, rights, and duties between the petitioner and its members created by the membership contract, the reserve accounts in issue herein, although denominated for convenience as reserves for bad debts and reserves for discounts, constituted liabilities of the petitioner to its members which were accruable and hence were not taxable as income to the petitioner. The respondent contends in his brief that the additions to the bad debt reserve *179 during the taxable years were in excess of the needs of the business and, further, that the additions to that reserve as well as the reserve for future discounts are not deductible as "so-called patronage dividends." Although the evidence before us leaves considerable doubt as to whether the amounts in dispute which petitioner added to its bad debt reserve during the taxable years were reasonable additions to such reserve, we think that for other reasons those amounts as well as the ones added to the reserve for future discounts should be eliminated from petitioner's taxable income for each of the years involved. The Circuit Court of Appeals for the Ninth Circuit recently held in San Joaquin Valley Poultry Producers' Association v. Commissioner, 136 Fed. (2d) 382, decided June 5, 1943 (reversing a Memorandum Opinion of this Court) that a farmers' cooperative association organized as a nonprofit corporation under the California statutes was not taxable on the undistributed portions of its net earnings which it credited on its books in 1936 and 1937 to three separate reserves designated "reserve for overpayment," "reserve for security of the membership *180 fund," and "reserve for zoning hazard." The taxpayer in that case sold eggs for its members and also supplies to members and nonmembers under a plan of operation similar to that which petitioner had with its members. The reasoning of the court was that since the taxpayer was prohibited by the laws of the State of California under which it was organized and by the provisions of its articles of incorporation and by-laws from realizing any net profits of its own the amounts which it retained as additions to the reserves belonged to its members and were not its income. The court said in its opinion: The sums so placed in these reserves - the $1,683.56, the $2,215.29, the $5,722.72, the $2,601.90 and the $5,358.46 - never became the property of petitioner, but were and are the property of the members. Bogardus v. Santa Ana Walnut Growers' Assn., 41 Cal. App. 2d 939, 946-949, 108 P. 2d 52, 56-58. See, also, Mountain View Walnut Growers' Assn. v. California Walnut Growers' Assn., 19 Cal. App. 2d 227, 65 P. 2d 80; Reinert v. California Almond Growers' Exchange, 9 Cal. 2d 181, 70 P. 2d 190. *181 To hold otherwise would be to hold that petitioner could and did "make a profit for itself, as such," in contravention of its by-laws, its articles of incorporation and the statute to which it owes its existence. Bogardus v. Santa Ana Walnut Growers' Assn., supra. Petitioner never pretended to be the owner of these sums, but, as required by its by-laws, "prorated" and credited them to its members. The fact that the sums were not payable to the members on demand, or at any fixed time, does not alter the fact that they were their property and not petitioner's. Petitioner held them not as owner, but as agent or trustee for the members. Bogardus v. Santa Ana Walnut Growers' Assn., supra.Since none of the sums ever belonged to petitioner, they could not be, and were not, income of petitioner. The facts in the instant case are not distinguishable from the facts in the San Joaquin Valley Poultry Producers' Association case. Petitioner was organized as a nonprofit corporation under the laws of the State of California and there were provisions in its articles of incorporation and its by-laws *182 which prohibited it from realizing any profit of its own from the sale of shook. Likewise, under its operating contract with its members it was obligated to distribute to them all of its net profits from such sales in excess of operating expenses and necessary reserve funds. The so-called reserve for bad debts was not in a true sense a bad debt reserve. It was not used exclusively to offset bad debt losses. From time to time excess accumulations in the fund were distributed to the members in proportion to their participation in the business and deficiencies in the fund were made up by direct assessments against the members. The retention in this reserve fund of a portion of the operating profits was nothing more than a postponement of the distribution of such amounts to the members, pending a final determination of the amounts which would be required to offset bad debt losses. If excessive amounts were withheld in one year they were distributed to the members in a subsequent year. Petitioner was obligated under its contract eventually to distribute any surplus in the fund to the members in proportion to their participation in the business. There was no means under the petitioner's *183 articles of incorporation or by-laws or its operating contract by which additions to the reserves could ever become its earnings. Petitioner had no right to accumulate earned surplus and was not authorized to make any dividend distributions to its members. In filing its orders for box shook the petitioner was under the necessity of making small purchases from nonmembers. Since the petitioner realized profits from such nonmember business which it was under no obligation to distribute, and did not distribute, to the nonmembers, it is not entitled to statutory exemption from tax under section 101 (12) I.R.C. and it makes no claim for such exemption. No issue has been raised in this proceeding as to either the gain or the loss from the nonmember business. We are not concerned here with the question of the deduction of patronage dividend distributions. As already pointed out, petitioner had no authority to make dividend distributions of any kind and had no rights to any profits or accumulated surplus from which dividends might be distributed. All funds coming into its possession, in excess of operating expenses, belong to the members and had to be returned to them. We think that the *184 amounts added to the reserves during the taxable years should either be eliminated from petitioner's gross income entirely or should be deducted from gross income as accrued liabilities. Our conclusion in this case is in conformity with the interpretation placed upon California law by the Circuit Court of Appeals for the Ninth Circuit, and in no way represents any questioning on our part of the general rules exemplified by the cases cited and distinguished by the Circuit Court in the San Joaquin Valley Poultry Producers' Assn. case. Decision of no deficiencies will be entered.