**UNITED GROCERS, LTD., Appellant,**

v.

**UNITED STATES of America,**
Appellee.

No. 17510.

United States Court of Appeals
Ninth Circuit.

Oct. 9, 1962.

Samuel Taylor, Robert M. Winokur, Charles deYoung Elkus, Jr., and Robert C. Elkus, San Francisco, Cal., for appellant.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Joseph Kovner, and Earl J. Silbert, Attys., Dept. of Justice, Washington, D. C., Cecil F. Poole, U. S. Atty., and Richard L. Carico, Asst. U. S. Atty., Los Angeles, Cal., for appellee.

Before CHAMBERS and HAMLIN, Circuit Judges, and JAMESON, District Judge.

JAMESON, District Judge.

This is a suit for refund of corporation income tax for the year 1954. Appellant is a cooperative nonprofit, membership California corporation, formed as a buying, marketing and service organization for its members. The question presented is whether monthly payments by taxpayer's members, together with initiation, transfer and withdrawal fees, are contributions to capital under section 118(a) of the Internal Revenue Code of 1954 and Treasury Regulations issued pursuant thereto,[1] as appellant contends, or payments for services and therefore includable within taxpayer's

---

1. "§ 118. *Contributions to the capital of a corporation.*

"(a) General rule.—In the case of a corporation, gross income does not include any contribution to the capital of the taxpayer." (26 U.S.C.A. § 118(a)) Treasury Regulations on Income Tax (1954 Code):

"§ 1.118–1. *Contributions to the Capital of a Corporation.*

"In the case of a corporation, section 118 provides an exclusion from gross income with respect to any contribution of money or property to the capital of the taxpayer. Thus, if a corporation requires additional funds for conducting its business and obtains such funds through voluntary pro rata payments by its shareholders, the amounts so received being credited to its surplus account or to a special account, such amounts do not constitute income, although there is no increase in the outstanding shares of stock of the corporation. In such a case the payments are in the nature of assessments upon, and represent an additional price paid for, the shares of stock held by the individual shareholders, and will be treated as an addition to and as a part of the operating capital of the company. Section 118 also applies to contributions to capital made by persons other than shareholders. For example, the exclusion applies to the value of land or other property contributed to a corporation by a governmental unit or by a civic group for the purpose of inducing the corporation to locate its business in a particular community, or for the purpose of enabling the corporation to expand its operating facilities. However, the exclusion does not apply to any money or property transferred to the corporation in consideration for goods or services rendered, or to subsidies paid for the purpose of inducing the taxpayer to limit production. See section 362 for the basis of property acquired by a corporation through a contribution to its capital by its stockholders or by nonstockholders."

gross income under section 61(a),[2] as appellee contends and as found by the trial court. The facts are set forth in detail in the district court's opinion reported at 186 F.Supp. 724.

Appellant's members are independent retail grocers. The excess of receipts over expenses from sales to members is returned to the members as patronage dividends at the close of each year. Groceries and services are sold to members and nonmembers at the same billing price, but nonmembers do not receive patronage dividends. Profits from sales to nonmembers and from investments are retained, do not enter into the computation of patronage dividends, and do not reduce the price of groceries purchased by members. Appellant included these profits in its taxable income and paid the tax thereon.

To acquire and maintain membership in United Grocers, Ltd., a retail grocer was required to pay (a) an initiation fee of $25, returnable if rejected for membership, but otherwise credited to capital; (b) a membership certificate fee of $50, refundable upon surrender of the certificate; (c) a payment into a guarantee fund of $500 (or $100 for both groceries and produce, with lesser amounts for junior members), refundable upon resignation from the corporation; (d) a monthly payment of $7.50 ($3.75 for junior members), treated by appellant as a contribution to capital;[3] (e) for a member desiring a withdrawal card, a fee of $3; and (f) a transfer fee of $10 for new members succeeding to the business of a retiring member. Items (b) and (c) were returnable on resignation and are not here involved. Of the $149,-493.25 income in question, $143,486.25 consisted of the $7.50 monthly payments.

The membership certificates may not be transferred or pledged; nor may "any other interest" the member "may have in this corporation or any assets thereof, or any funds on deposit therewith".

From its organization in 1910 until 1952, appellant's members were required to make monthly payments called "dues". Since the early 1920's the dues were $7.50 per month (less for junior members). The dues were included in gross income, but no tax was paid thereon, since they were also included with payments for purchases of groceries in computing patronage dividends, and in effect returned to the members.

At a special meeting of the members on December 27, 1951,[4] the articles of incorporation and by-laws were amended to give the board of directors power to determine from time to time whether some portion or all of the $7.50 monthly payments would be "dues" or "assessments as contributions to capital". While no formal resolution was adopted by the board of directors, the corporation did in fact put into operation a plan to treat the monthly payments as capital contributions.

Beginning with the year 1952, appellant discontinued the "dues" account in

2. "§ 61. *Gross Income Defined.*
   "(a) General definition.—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:
   "(1) Compensation for services, including fees, commissions, and similar items;
   "(2) Gross income derived from business; * * *." (26 U.S.C.A. § 61(a))

3. The articles of incorporation provide that the directors shall determine from time to time whether dues and/or assessments as capital contributions shall be made by the members, and the amounts and times of payment, dues not to exceed $7.50 per month ($3.75 for junior members), and assessments as contributions to capital not to exceed $10 per month ($5 for junior members).

4. A letter from appellant's secretary-treasurer dated September 19, 1951, stated that the proposed amendments to provide for "using dues for capital contributions" were designed to guard against unfavorable future tax legislation and provide additional funds in the event of a depression or other unforeseen emergency; and that, "With the exception of the difference in the method of accounting for the dues, the terminology does not effect any change in the method of our operation."

the books of the corporation and included the monthly payments in a "capital contributions" account. The monthly billing to members was also changed from "dues" to "capital contributions—(dues)", although the payments were still shown with grocery purchases as accounts receivable on the members' ledger accounts. The monthly payments, together with initiation fees, withdrawal fees, and transfer fees were shown as contributions to capital in all of appellant's financial statements and annual accounting reports, which were approved each year by the board of directors. The members continued to receive the same services for their fees and payments. The monthly payments, however, were no longer applied to reduction of operating expenses and hence were not included in the computation of patronage dividends, but were retained by appellant.

For the year 1954 appellant's working capital increased $628,758.51. Its "capital contributions" totaled $149,493.25. For the five-year period 1952 to 1956, inclusive, the working capital increased $1,-350,500.68, while the "capital contributions" were $816,615.00.

Appellant first questions the finding of the trial court that appellant's board of directors, in failing to adopt a formal resolution to assess the members for monthly contributions to capital, "did not determine the matter in the manner provided for corporate action, especially a matter of importance in its effect upon the rights of its members and the government as well". Appellee, however, does not urge this finding as the basis for affirmance, but states in its brief that, "The only issue presented on appeal to this Court is the correctness of the District Court's holding that all these payments were gross income to the taxpayer on the ground that since the payments were solely for current services rendered, were not needed for capital outlays, were not returnable to members, and did not increase the members' equity in the taxpayer, they lacked the ordinary characteristics of capital contributions." [5]

Apparently there is no contention that the trial court's findings on other basic facts are clearly erroneous. All are supported by substantial evidence. Appellant, however, questions the court's ultimate finding that the payments involved were "not capital contributions, but payments by members in consideration of, and in payment for, the services rendered by the corporation to the contributors * * *".

■ The Supreme Court has held in many cases that through the broad language of section 61(a) [6] and its predecessor (section 22(a) Internal Revenue Code 1939) Congress intended to exert "the full measure of its taxing power" and to "tax all gains except those specifically exempted".[7] Were the payments here involved specifically exempted by section 118(a) [8] as contributions to the capital of taxpayer?

■ Section 118 had no counterpart in the 1939 Code. Legislative history accompanying its passage makes it clear that the section codifies existing law, as developed from administrative and court decisions, exempting from taxation voluntary contributions, whether made by shareholders or nonshareholders, where the money or property was not transferred to the corporation in consideration for goods or services rendered.[9] Accord-

5. It is unnecessary accordingly to consider the effect of the board's failure to adopt a formal resolution. This opinion should not be construed as approving the trial court's finding on this point.

6. Note 2, supra.

7. Commissioner v. Glenshaw Glass Co., 1955, 348 U.S. 426, 429, 430, 75 S.Ct. 473, 475, 476, 99 L.Ed. 483, rehearing denied 349 U.S. 925, 75 S.Ct. 657, 99 L.Ed. 1256; Commissioner v. LoBue, 1956, 351 U.S. 243, 76 S.Ct. 800, 100 L.Ed. 1142, rehearing denied 352 U.S. 859, 77 S.Ct. 21, 1 L.Ed.2d 69.

8. Note 1, supra.

9. See Senate Report No. 1662 and Conference Report No. 2543, which accompany the Internal Revenue Code of 1954, set forth at pp. 4793, 4825 and 5280, 3 U.S.Code Cong. & Adm.News (1954).

ingly, while there are no cases precisely in point, cases prior to the enactment of section 118 which have considered somewhat analogous situations are pertinent.

Counsel for both parties rely upon decisions of the Supreme Court, appellee upon Detroit Edison Co. v. Commissioner, 1943, 319 U.S. 98, 63 S.Ct. 902, 87 L.Ed. 1286, and appellant upon Brown Shoe Co. v. Commissioner, 1950, 339 U.S. 583, 70 S.Ct. 820, 94 L.Ed. 1081.[10] In Detroit Edison the court held that payments by farmers and other customers to the utility for an extension of its facilities were not gifts or contributions to the company, but "were to the customer the price of the service". In Brown Shoe, it was held that cash and other property received from certain community groups as inducements to the location or expansion of the taxpayer's manufacturing operations in the communities were contributions and that taxpayer accordingly was entitled to deductions on account of depreciation.[11] In distinguishing Detroit Edison, the Court said:

"Because in the Detroit Edison case 'The payments were to the customer the price of the service,' the Court concluded that 'it overtaxes imagination to regard the farmers and other customers who furnished these funds as makers either of donations or contributions to the Company.' Since in this case there are neither customers nor payments for service, we may infer a different purpose in the transactions between petitioner and the community groups. The contributions to petitioner were provided by citizens of the respective communities who neither sought nor could have anticipated any direct service or recompense whatever, their only expectation being that such contributions might prove advantageous to the community at large. Under these circumstances the transfers manifested a definite purpose to enlarge the working capital of the company." (339 U.S. at 591, 70 S.Ct. at 824.)

Detroit Edison was followed in Teleservice Co. of Wyoming Valley v. Commissioner, 3 Cir., 1958, 254 F.2d 105, cert. denied 357 U.S. 919, 78 S.Ct. 1360, 2 L.Ed.2d 1364, decided subsequent to the enactment of section 118. In that case it was held that contributions received by a television signal transmission service from its customers toward the cost of constructing facilities, under a contract which also provided for monthly maintenance charges, were not gifts or capital contributions, but part of the price of the service. The initial payments for construction, however, were required before the customer became eligible to receive service upon further payment of the monthly service charges.[12]

In Affiliated Government Employees' Distributing Co. v. Commissioner, 37 T. C. 909, filed February 12, 1962, the Tax Court held that membership fees in a California nonstock corporation, operating a group of department stores for the exclusive use of its members and their guests, were taxable income and not exempt as a capital contribution under section 118. The court held that the "important consideration relates more to the

---

10. See also Edwards v. Cuba Railroad, 1925, 268 U.S. 628, 45 S.Ct. 614, 69 L.Ed. 1124; Commissioner of Int. Rev. v. McKay Products Corp., 3 Cir., 1949, 178 F.2d 639; 7 Mertens Law of Federal Income Taxation § 38.23.

11. The cash received (which was less than the amount expended for local factory buildings and equipment) was not earmarked or segregated, but was deposited in the taxpayer's general banking account. In this respect the procedure followed was similar to the instant case.

12. The contributions received were less than the construction costs and were segregated on the taxpayer's books as capital contributions; the customers were advised that the contributions were in aid of construction and had no bearing on the monthly service charges; the contributor could not sell, assign or transfer his eligibility to receive signals; and the subscribers were not entitled to any repayment, except for a partial refund if the taxpayer terminated the service for its own convenience.

real nature of these fees than to the theoretical status of the members", and continued, "We are satisfied that the dominant if not the only purpose for which members 'joined' petitioner and paid the requisite fee was to be permitted to shop at petitioner's stores where they expected to obtain bargains."

While there are many points of similarity between both Teleservice Co. of Wyoming Valley and Affiliated Government Employees' Distributing Co. and the instant case, they may be distinguished on the basis that Teleservice Co. of Wyoming Valley required the contribution as a condition to receiving service and Affiliated Government Employees' Distributing Co. required payment of membership fees as a condition to the right to shop in the taxpayer's stores. Here nonmembers could purchase groceries and services. They were not, however, entitled to the reduced prices obtainable through patronage dividends.

Appellant relies primarily upon the trial court's findings (1) that appellant's merchandise and services were available to members and nonmembers at the same price, although only members received patronage dividends (and were subject to assessments to cover any operating deficits); (2) that appellant's members received no consideration in the form of merchandise or services for any of the payments in question, and the only benefit they obtained from membership was the right to patronage dividends; (3) that beginning in 1952 the payments were retained by the corporation and not returned as a part of the patronage dividends; (4) that although the contributions were not earmarked for capital, the actual expenditure for capital each year exceeded the total of all payments in question; and (5) that in 1951 appellant was in need of capital for normal expansion purposes.

Appellee relies upon the findings (1) that the members received the same rights and services from the corporation as they had prior to 1952; (2) that the payments were not earmarked for capital and could be used for ordinary operating expenses; (3) that the contributor was not entitled either to a return on his investment or a stated equity interest in the cooperative, returnable upon liquidation, but upon liquidation all assets would be distributed to the then members, without regard to the amounts of their respective contributions; (4) that the contributions were not voluntary payments within the meaning of Treasury Regulation 1.118–1, supra, but rather payments required of members in consideration of corporate services rendered; (5) that the contributions were not required as additional capital, but there were other assets, actual and potential, for all reasonably necessary capital purposes; and (6) that the evidence does not disclose "any of the ordinary characteristics of capital contributions", but the payments were for services, "i. e., the services of mass buying power through the device of patronage dividends".

All facts upon which both parties rely are pertinent. No one is decisive. On the basis of one or more factors all of the cases cited by both parties are factually distinguishable. Under this situation it is clear from both Brown Shoe, supra, and Detroit Edison, supra, that the motive or purpose and intent in making the contributions is a dominant factor in determining whether it was a capital contribution or payment for goods and services.

It is true, as appellant contends, that the payments were not made for the purchase of goods or services, but solely to qualify a member to share in patronage dividends. Obviously, however, the dominant purpose for members was to obtain merchandise and services at the lowest possible prices. While members and nonmembers were billed for the same amount the members in effect received reduced prices through the patronage dividends. Each member was a retail grocer who, as a practical matter, was not interested in an investment or the well-being of appellant, except as an incident to his need to purchase groceries at advantageous and competitive prices. It is reasonable to assume that a member would

continue to pay the fees and monthly assessments only so long as the total amount paid remained less than the cost of similar merchandise and services elsewhere. As was said in Detroit Edison, supra, "The payments were to the [member] the price of the service."

There was no motive to benefit the general community, as in Brown Shoe. Nor was there any investment motive, since the member acquired no equivalent equity interest in the cooperative. A member who paid $90 annually for many years would have no greater interest upon liquidation than a new member who had made his first monthly payment.[13] Any member who withdrew prior to liquidation would forfeit his right to share in the property of the corporation.[14] While the acquisition of an increased equity or interest in the corporation is not a requisite of a capital contribution, the presence or absence of such interest has a bearing upon the motive of the person making the payment.

The district court correctly concluded that since members were required to make the payments in question "as a condition of the entitlement to its services, patronage dividends or otherwise", they must be held to be payments for those services unless the evidence shows that the "contributions carry other entitlements apart from the services and so characteristic of capital contributions as to negative mere payment for services as their exclusive or primary purpose". We agree with the trial court that the evidence fails to establish characteristics of a capital contribution sufficient to negative the members' dominant purpose to obtain groceries and services at reduced prices through the privilege of patronage dividends.

We agree also with the trial court that the payments did not constitute "voluntary pro rata" payments within the meaning of Treasury Regulation 1.118–1.[15] While membership was not required for the purchase of groceries or services, a member was obliged to make the monthly payments in order to obtain the reduced prices through the patronage dividends.

Our conclusion that the payments in question were not contributions to capital is consistent with this court's decisions in Co-operative Oil Ass'n v. Commissioner, 9 Cir., 1940, 115 F.2d 666, and San Joaquin Valley Poultry Producers' Ass'n v. Commissioner, 9 Cir., 1943, 136 F.2d 382, discussed in the trial court's opinion. 188 F.Supp. at 735.[16]

---

13. By way of contrast the membership certificate fee and the payments into the "guarantee fund" for use as working capital were returnable and admittedly not taxable income.

14. This is not an unusual attribute of membership in such associations. Generally a voluntary withdrawal of members from a nonprofit corporation severs membership and all connection with, or interest in, its business, property and assets. 18 C.J.S. Corporations § 480 note 84, p. 1152; Bogardus v. Santa Ana Walnut Growers Ass'n, 1940, 41 Cal.App.2d 939, 108 P.2d 52, 58.

15. Whether a contribution is voluntary has arisen in other transactions, including cases involving the cancellation of indebtedness and other claims. Where the contribution is made pursuant to some obligation or where some consideration is received, there is not that "gratuitous contribution to capital" which exempts the corporation from the payment of income tax. See discussion in 7 Mertens Law of Federal Income Taxation § 38.22 (accord. Rev.Rul. 57–375, Mertens, supra, Rulings Volume); Chenango Textile Corp. v. Commissioner, 2 Cir. 1945, 148 F.2d 296; Commissioner v. Vandeveer, 6 Cir. 1940, 114 F.2d 719, 722; Helvering v. Jane Holding Corporation, 8 Cir. 1940, 109 F.2d 933; Ackerman v. Commissioner, 7 Cir. 1935, 76 F.2d 833; United States v. E. L. Bruce Co., 6 Cir. 1950, 180 F.2d 846, 849.

16. The able and comprehensive opinion of the trial judge also discussed in more detail the principles of law which have guided other courts in determining whether, under particular facts, payments by shareholders of a stock corporation and member-patrons of a cooperative (as well as payments by others who have no proprietary interest) were contributions to capital. We do not deem it necessary to repeat any citation or analysis of those cases.

Appellant also relies upon the testimony of two expert accountants that as a matter of sound accounting practice the payments constituted contributions to capital. Counsel argue that a "key point" in Brown Shoe was the "reliance upon accounting practice in order to ascertain what constitutes capital contributions". It is true that it is stated in Brown Shoe, "The values which the taxpayer received were additions to 'capital' as that term has commonly been understood in both business and accounting practice; * *." However, in the subsequent case of American Automobile Assn. v. United States, 1961, 367 U.S. 687, 81 S.Ct. 1727, 6 L.Ed.2d 1109, where it was "admitted that for [the taxpayer's] purposes the method used is in accord with generally accepted commercial accounting principles", the Court held that this does not mean that for income tax purposes it "reflects income as to be binding upon the Treasury". While testimony relative to accepted accounting practice may properly be considered by the court, it is not conclusive in determining the legal tax consequences of any transaction.

Moreover, "the incidence of taxation depends upon the substance, not the form, of the transaction",[17] and the essence of any arrangement must be "determined not by subtleties of draftsmanship but by their total effect".[18] "It is an axiom of tax law that the form of a transaction may not govern its tax consequences where the substance of what was accomplished demands another result." [19] In substance the fees and payments by the members here were for the right and privilege of obtaining merchandise and services at reduced prices through patronage dividends, and not contributions to capital exempt from gross income under section 118.

Judgment affirmed.

17. Commissioner v. Hansen, 1959, 360 U.S. 446, 79 S.Ct. 1270, 3 L.Ed.2d 1360, and cases there cited.

18. Commissioner v. P. G. Lake, Inc., 1958, 356 U.S. 260, 266, 78 S.Ct. 691, 695, 2

L.Ed.2d 743, rehearing denied 356 U.S. 964, 78 S.Ct. 991, 2 L.Ed.2d 1071.

19. Anderson v. United States, 9 Cir. 1956, 232 F.2d 794, 800.