## COMMISSIONER OF INTERNAL REVENUE v. VANDEVEER.

### No. 8168.

Circuit Court of Appeals, Sixth Circuit.

Sept. 16, 1940.

720

L. W. Post, Sp. Asst. to Atty. Gen. (James W. Morris, Asst. Atty. Gen., and Sewall Key and Joseph M. Jones, Sp. Assts. to Atty. Gen., on the brief), for petitioner.

David A. Gaskill, of Cleveland, Ohio, and C. J. McGuire, of Washington, D. C. (Thompson, Hine & Flory, David A. Gaskill, and Earl P. Schneider, all of Cleveland, Ohio, on the brief), for respondent.

Before HICKS, SIMONS, and ARANT, Circuit Judges.

ARANT, Circuit Judge.

This is a petition by the Commissioner of Internal Revenue to review determinations of the Board of Tax Appeals that petitioner overpaid $4,493.77 in income tax for the year 1930 and owes $2,065.51 for the year 1931.

W. W. Vandeveer and F. R. Newman organized the Allied Oil Company, Inc., in 1925, to sell and distribute fuel oil. From the beginning they owned all the common stock, with the exception of qualifying shares, and one hundred and fifty of the six hundred shares of preferred stock. With the knowledge and approval of the other preferred stockholders, the corporation agreed to pay Vandeveer and Newman for their services stated salaries and bonuses based upon the company's earnings.

In its early years, the Company was primarily a broker, but in 1929 former sources of supply became unreliable, and it concluded that its way of doing business must be changed. Accordingly, it decided to build storage facilities in Cleveland and purchase a tank ship to enable it to reach more dependable and economical sources of supply. By the end of the year, a steamship costing $180,000 had been purchased, other commitments had been made, and additional capital was being sought. The Company, in the meantime, had become unable to pay Vandeveer and Newman in cash the approximately $220,000 due for bonuses. In 1930 the Central United National Bank granted the Company a loan of $125,000, but demanded that the bonus accounts be liquidated and the Company's net worth increased to $300,000. Pursuant to this arrangement, Vandeveer and Newman each subscribed for nine hundred and fifty shares of a new issue of no par value com-

mon stock, at $130 per share, for which they later paid by cancellation of their accrued bonus claims and payment of approximately $26,000 each in cash. In the following year, they each subscribed for two hundred and fifty-four shares of a new issue of preferred stock at $100 per share, for which they paid by releasing their bonus claims for $25,336.16 each, and authorizing charge of the balance due to their respective accounts.

Both Vandeveer and Newman petitioned the Board for review of the Commissioner's assertion of tax deficiencies for the years 1930 and 1931. The Board heard their petitions together and drafted an opinion applicable to both. Separate petitions for review were filed, but, inasmuch as similar facts and identical questions of law are involved, we ordered that our decision in this case shall control Newman's companion case.

Respondent has always reported his income on a cash basis, as authorized by statute. Since the income in question was not in the form of cash, he was required to report its cash equivalent. Whether the Board has correctly determined the cash equivalent of the stock received is the only question here presented. Is the cash equivalent, as decided by the Board, the value of the stock received in extinguishment of the bonus claims? Or is it, as contended by the Commissioner, the amount credited for bonuses?*

In Missouri State Life Insurance Company v. Helvering, 8 Cir., 78 F.2d 778, the Circuit Court of Appeals for the Eighth Circuit held that accrued interest is received and taxable as income when a mortgagee purchases at a foreclosure sale if his bid exceeds the principal indebtedness, though the property is in fact worth less. Two years later, when the same question was presented to us in Midland Mutual Life Ins. Co. v. Helvering, 6 Cir., 83 F.2d 629, we declined to follow the Eighth Circuit. The Supreme Court reversed us, Helvering v. Midland Mut. Life Ins. Co., 300 U.S. 216, 57 S.Ct. 423, 81 L.Ed. 612, 108 A.L. R. 436, settling the law applicable to that situation in accordance with the Eighth Circuit decision.

But another question was involved in the Missouri Life case, namely, whether a mortgagee receives interest when he accepts a voluntary conveyance of mortgaged property worth less than the amount of the principal indebtedness in satisfaction of principal and accrued interest. The Eighth Circuit answered that question in the negative. In the Midland case, we said the manner in which the mortgaged property was acquired is immaterial in determining whether interest was received; that if the value of what the mortgagee receives does not in fact exceed his investment, he derives no income.

Since the Midland decision, the Board of Tax Appeals has applied the distinction laid down in the Missouri Life case. See Manhattan Mut. Life Ins. Co. v. Commissioner, 37 B.T.A. 1041. Nevertheless the Commissioner relies upon the Midland de-

---

* The statute and regulations involved follow:

Revenue Act of 1928, c. 852, 45 Stat. 791, 26 U.S.C.A.Int.Rev.Acts, page 354:

"Sec. [§] 22. Gross Income

"(a) *General Definition.* 'Gross· income' includes gains, profits, and income derived from salaries, wages, or compensation for personal service, of whatever kind and in whatever form paid, * * *."

Treasury Regulations 74, promulgated under the Revenue Act of 1928.

"Art. 51. *What included in gross income.*—Gross income includes in general compensation for personal and professional services, business income, profits from sales of and dealings in property, interest, rent, dividends, and gains, profits, and income derived from any source whatever, unless exempt from tax by law. (See sections 22 (b) and 116 [26 U.S.C. A.Int.Rev.Acts pages 354, 386]). In gen-

eral, income is the gain derived from capital, from labor, or from both combined, provided it be understood to include profit gained through a sale or conversion of capital assets. * * * Income may be in the form of cash or property. * * *"

"Art. 53. *Compensation paid other than in cash.*—If services are paid for with something other than money, the fair market value of the thing taken in payment is the amount to be included as income. If the services were rendered at a stipulated price, in the absence of evidence to the contrary such price will be presumed to be the fair value of the compensation received. If a corporation transfers to its employees its own stock as compensation for services rendered by the employee, the amount of such compensation to be included in the gross income of the employee is the fair market value of the stock at the time of the transfer."

cision in support of his contention that the subscription price of the stock, irrespective of its value, measures the income respondent received. Implicit in such reliance is the assumption that the Supreme Court will not uphold the distinction laid down in the Missouri Life case.

In the Midland case, Mr. Justice Brandeis said: "The 'reality' of the deal here involved would seem to be that respondent valued the protection of the higher redemption price as worth the discharge of the interest debt for which it might have obtained a judgment." 300 U.S. 224, 57 S. Ct. 426, 81 L.Ed. 612, 108 A.L.R. 436. We do not believe the Supreme Court will extend the doctrine of the Midland case to a situation in which the power of redemption is not involved. See opinion of Simons, J., in Midland Mut. Life Ins. Co. v. Helvering, supra; Paul, Federal Income Tax Problems of Mortgagors and Mortgagees, 48 Yale Law Jour. 1316.

It is true that Mr. Justice Brandeis added: "The administration of the income tax law would be seriously burdened if it were held that when a mortgagee bids in the property for a sum including unpaid interest, he may not be taxed on the interest received except upon an inquiry into the probable fair market value of the property." But, in nearly all ·cases in which property other than money is received as income, its value must be determined, Pearce, Income Tax Fundamentals, 34, and Treasury regulations expressly permit inquiry as to the fair market value for the benefit of mortgagees other than life insurance companies attempting to establish a capital loss arising from foreclosure. Moreover, no mortgage is here involved and the standard of evaluation of stock received for services rendered has been set up in Treasury Regulations. See Treas. Reg. 74, Article 53; Treas.Reg. 69, Art. 153 (1926); Treas.Reg. 74, Art. 193 (1928); Treas.Reg. 77, Art. 193 (1932); Treas.Reg. 86, Art. 23(k)-3 (1934); Treas.Reg. 94, Art. 23(k)-3 (1936). Cf. Hulse, Mortgage Foreclosures Under the Federal Income Tax Regulations (1936) 14 Tax. Mag. 451.

■ We are of the opinion that the transactions between respondent and the corporation constituted a compromise of his claims for services rendered and that the income derived was the fair market value of the stock received in settlement of his claims. To approve the Commissioner's contention would be to ascribe to an ordinary business transaction an economic significance not in accord with the understanding of ordinary business men. See Magill, The Taxation of Unrealized Income, 39 Harvard L.Rev. 82, 84. Cf. 1 Paul & Mertens, Law of Federal Income Taxation, § 9.05.

■ The Commissioner next contends that the value of the stock would have been found to correspond to subscription price had the Board applied proper standards of evaluation. He urges that the Board erred in giving too little weight to book value. While the disparity between book value and the value found by the Board is marked, there was evidence that certain accounts receivable were of doubtful worth, that the steamship had depreciated notably, and that the value of storage tanks, leaseholds and the like was contingent upon the success of the new venture. Nor were the exactions of the Bank as a condition of its loan without significance. We think the Company's prospects may properly have been considered by the Board to outweigh other factors in determining the value of its stock. Behles v. Commissioner, 7 Cir., 87 F.2d 228, 230; Couzens v. Commissioner, 11 B.T.A. 1040. The inferences from all the evidence were for the Board. Its findings of fact are supported by substantial evidence, and we may not disturb them. Bogardus v. Commissioner, 302 U. S. 34, 58 S.Ct. 61, 82 L.Ed. 32; Helvering v. Lazarus & Co., 308 U.S. 252, 60 S. Ct. 209, 84 L.Ed. 226.

■ Finally, the Commissioner argues that, if these transactions were compromises of respondent's claims, he made capital contribution to the extent of the difference between the value of the stocks received and the claims cancelled, which would not have been possible if respondent had not received something to contribute. The gravamen of this argument is that, unless respondent is taxed on this difference, gains clearly derived, but not taxed in prior years because of deductions allowed for accrued salaries and bonuses, will escape taxation altogether under the favor extended to capital contributions. The assumption that respondent made capital contribution is the flaw in this argument. When, as here, the stockholder received consideration, there is not that gratuitous contribution to capital which exempts the corporation from payment of income tax. Helvering v. Jane Holding Corp., 8 Cir., 109 F.2d 933. Settlement

with employees for less than amounts previously deducted as expense frees assets pro tanto for the employer's general use and results in a corresponding realization of income, which is taxable in the year in which the compromise occurs. See Maryland Casualty Co. v. United States, 251 U. S. 342, 40 S.Ct. 155, 64 L.Ed. 297.

The judgment of Board of Tax Appeals is affirmed.