**CRYSTAL LAKE CEMETERY ASSOCI-
ATION, a Minnesota Corporation,
Appellant,**

v.

**UNITED STATES of America,
Appellee.**

No. 19534.

United States Court of Appeals
Eighth Circuit.

July 22, 1969.

Philip J. Stern, Minneapolis, Minn.,
for appellant.

Thomas L. Stapleton, Atty., Dept. of
Justice, Washington, D. C., for appellee,
Johnnie M. Walters, Asst. Atty. Gen.,
Dept. of Justice, and Lee A. Jackson and
Stanley L. Ruby, Attys., Washington, D.
C., and Patrick J. Foley, U. S. Atty.,
Minneapolis, Minn., on the brief.

Before MATTHES, GIBSON and
BRIGHT, Circuit Judges.

FLOYD R. GIBSON, Circuit Judge.

Crystal Lake Cemetery Association
("taxpayer") appeals from a judgment
entered in the United States District

Court for the District of Minnesota, Chief Judge Edward J. Devitt, finding against taxpayer in its action to recover federal income tax paid[1] for 1962 attributable to a $50,000 distribution to taxpayer from its permanent care and improvement fund, such distribution being for the purpose of erecting an administration building. The District Court found that there was no basis for excluding the $50,000 from taxpayer's income in 1962 as a contribution to capital under § 118 of the Internal Revenue Code, 26 U.S.C. § 118,[2] and there was no other basis for excluding it from the statutory definition of income as set forth in § 61 of the Code, 26 U.S.C. § 61.[3]

We affirm the judgment of the District Court.

The taxpayer is a for-profit corporation organized in 1897 under the laws of Minnesota for the purpose of operating a cemetery; it occupies 106.71 acres of land in the city of Minneapolis for that purpose. On August 3, 1928, in order to comply with the law of Minnesota,[4] the taxpayer, through its board of directors, entered into an agreement establishing the Crystal Lake Cemetery Association Permanent Care and Improvement Fund. The agreement provided in part that taxpayer would pay over to the trustee of the fund in each year not less than 20 per cent of the proceeds of all sales of cemetery lots in Crystal Lake Cemetery, such payment to become part of the permanent care and improvement fund. At least semiannually, the trustee would turn over to the treasurer of the Cemetery the entire net income arising from investment of the permanent fund, which income was to be used solely for the care, maintenance and improvement of Crystal Lake Cemetery. If any portion of such income was not expended or appropriated for the period of one year, it was to be turned back to the trustee and invested as part of the principal of the permanent fund.

Taxpayer could, by resolution adopted by vote of at least two-thirds of the members of its board, authorize the withdrawal and use of not more than 50 per cent of the principal of the permanent fund for certain cemetery purposes,[5] provided, however, that the

---

1. Taxpayer's claim plus interest amounts to $28,374.47.

2. 26 U.S.C. § 118 reads in relevant part: "(a) General rule.—In the case of a corporation, gross income does not include any contribution to the capital of the taxpayer."

3. 26 U.S.C. § 61 reads in relevant part: "(a) General definition.—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived * * *."

4. 20 M.S.A. § 306.76 reads: "Every cemetery association heretofore or hereafter organized under the laws of this state, which shall maintain a public cemetery in or adjacent to any city of this state having a population of more than 50,000, shall provide for the creation and establishment of a permanent fund, the income whereof shall be devoted to the care, maintenance, and improvement of such cemetery, which fund shall be known as the permanent care and improvement fund of such cemetery association."

5. 20 M.S.A. § 306.79 authorizes: "* * * the withdrawal and use of not more than 50 per cent of the principal of such permanent care and improvement fund for any or all of the following purposes: for the acquisition of additional land for cemetery purposes for the erection of a chapel, greenhouse, or other buildings desirable or necessary for the operation of such cemetery, or for the building or improvement of roads and avenues in such cemetery * * *." As noted by the District Court in its conclusions of law: "It may well be doubtful that Minnesota Statutes Annotated, Section 306.79 authorized the withdrawal of permanent care funds for the erection of any kind of a building (the statute, as amended in 1923 is not clear whether the authority extends to a 'chapel, greenhouses or other building,' or only to the acquisition of land for such buildings) * * *." We do not reach this question and for purposes of this appeal we view the with-

fund should at no time be diminished to an amount less than $1,000 per acre for each acre of land in the Cemetery. On January 22, 1962, the taxpayer's board of directors adopted a resolution to withdraw and use not more than 50 per cent of the principal of the permanent fund, the money so withdrawn to be used for erection of an administration building. Pursuant to the resolution, the trustee disbursed $24,000 to taxpayer on October 2, 1962, and $26,000 to taxpayer on November 13, 1962. It is not disputed that the disbursement of $50,000 complied with the limitation per acre and did not operate to diminish or reduce the fund beneath the statutory or trust agreement restriction. (The trust corpus was $108,351 after the distribution, which was in excess of the minimum figure of $106,710 imposed by the restriction.) The $50,000 was used by taxpayer in the construction of an administration building costing $113,808.-98.

Upon audit of taxpayer's federal income tax return for the year 1962, the Commissioner of Internal Revenue determined that the withdrawal of the $50,000 in 1962 from the permanent care fund was income to taxpayer in that year. On September 15, 1965, taxpayer paid the resulting deficiency and subsequently filed a claim for refund, which was disallowed by the Commissioner on January 11, 1966. Taxpayer then brought suit in the District Court, and

the Court sustained the position of the Commissioner.[6]

Taxpayer contends that the District Court erred in that the $50,000 remitted from the trustee to taxpayer constituted a § 118 contribution to capital and not taxable § 61 income. Taxpayer argues that it received no economic benefit from the withdrawal of the funds and subsequent erection of the building; the substance of the transaction was in furtherance of cemetery purposes which is the concern of and for the primary benefit of the lotholders—taxpayer's economic benefit is negligible since after all lots are sold, the building, while benefiting the cemetery and lotholders, will be a liability to taxpayer; all it actually received for the $50,000 expended was the use and occupancy of the building, and the rental value of land occupied by its owner is not income to the owner. Taxpayer further contends that the $50,000 is not referable to § 111 of the Code [7] as recovery of monies from which a tax benefit accrued because it fails to meet the test of correlation—correlation between the transaction involved and the accumulation of the fund from which the withdrawal was effected. (Or, in other words, the "tax benefit rule" was not applicable.)

Taxpayer attempts to buttress its case by pointing to Minnesota law recognizing lotholders as the beneficiaries of the perpetual care and maintenance fund and severely circumscribing taxpayer's

drawal and use of the $50,000 as within the statutory authorization.

6. Initially, taxpayer's claim for refund included income taxes paid on $12,000 paid over to the permanent care fund in 1961 and $10,000 paid in 1963. The District Court found these amounts were contributed in compliance with 20 M.S.A. § 306.78; and the perpetual care and maintenance fund constituted an irrevocable trust, which made the contributions excludable from gross income under Revenue Ruling 58–190. The government did not appeal this finding.

7. 26 U.S.C. § 111 reads in relevant part: "(a) General rule.—Gross income does not include income attributable to the recovery during the taxable year of a

bad debt, prior tax, or delinquency, amount, to the extent of the amount of the recovery exclusion with respect to such debt, tax, or amount. "(b) Definitions.—For purposes of subsection (a)—

\* \* \* \* \*

"(4) Recovery exclusion.—The term 'recovery exclusion', with respect to a bad debt, prior tax, or delinquency amount, means the amount, determined in accordance with regulations prescribed by the Secretary or his delegate, of the deductions or credits allowed, on account of such bad debt, prior tax, or delinquency, amount, which did not result in a reduction of the taxpayer's tax under this subtitle \* \* \*."

ability to alienate or mortgage the asset obtained with the contribution. Taxpayer reasons that under the "claim of right doctrine" the contribution cannot be considered taxable since the money was received by taxpayer under no claim of right thereto, but only for a restricted or limited purpose. Further, the contribution was not subject to the "unfettered command" of recipient taxpayer as the restricted power to invade the corpus of the trust was not "unfettered." Invading the corpus for the benefit of the lotholders, consummation of a trust purpose, cannot be deemed income to taxpayer.

■ We hold that the $50,000 disbursed to taxpayer cemetery from the perpetual care and maintenance fund and used for the erection of an administration building constituted income to taxpayer. We agree with the District Court that "the principal purpose of the building was, or has been, to serve the profit-making activities of the taxpayer, rather than to provide for the 'perpetual care and maintenance' of the cemetery."

The evidence fully supports the finding that the primary purpose of the administration building was to aid the profit-making aspect of the taxpayer's business and lotholders were only incidentally benefited. The building was used as a general office for operation of the entire cemetery and was owned solely by the taxpayer, not by the perpetual care trust. Taxpayer conducted all aspects of its business from the building —sale of lots, records and billing, and supervision of maintenance. Equipment and supplies used in maintenance were housed in a separate building. The building contained conference rooms used for sales purposes and a carport used solely for personal automobiles.[8]

Under these circumstances there was an accession to taxpayer's wealth in the form of the $50,000 received from the fund which taxpayer used to erect its own building to be used primarily in its own profit-making activities. Taxpayer received the $50,000 under a claim of right. That part of the fund in excess of the minimum prescribed by the Minnesota law, was subject to the unfettered command of taxpayer, save only for the broad directive that the funds be used for the acquisition of additional land, erection of buildings necessary or desirable, or the building and improvement of roads. Upon the withdrawal of such amounts, the trustee of the fund was discharged from any and all liability for the part of the funds so withdrawn.

Taxpayer received much more in the way of an economic benefit than an amount equal to the fair rental value of the building, thus making inapplicable the rule stated in Helvering, Commissioner of Internal Revenue v. Independent Life Insurance Co., 292 U.S. 371, 379, 54 S.Ct. 758, 78 L.Ed. 1311 (1934) that rental value of a building occupied by owner does not constitute taxable income. The $50,000 withdrawn and used to help construct the administration building were before-tax dollars, obviating the necessity of taxpayer utilizing

8. In Gracelawn Memorial Park v. United States, 260 F.2d 328, 332 (3 Cir. 1958), the Court considered whether the portion of the sales price of lots paid into a building trust fund constituted taxable income:

"* * * [S]uppose the building fund does provide a building for administration * * *. It appears from the depositions in this case that the present administration building, deemed inadequate by an officer of Gracelawn, is used for salesmen's meetings and other activities pursuant to the running of an enterprise for profit."

The Court held the portion of the proceeds from lot sales that went into the trust fund was taxable income and stated at 332 of 260 F.2d:

"In other words, we find in this careful document a provision for what is in effect a deferred building fund for the purpose of the taxpayer's enterprise for profit. Of course these provisions benefit a lot owner in the sense that it makes his purchase one in a more desirable and better kept-up cemetery. But we think the provision for a capital fund is there just the same and it is for the corporation's benefit."

$50,000 of its after-tax dollars in the erection of the building.

The general rules in this area are well-summarized in Mount Vernon Gardens, Inc. v. Commissioner of Internal Revenue, 298 F.2d 712, 716 (6 Cir. 1962):

"[T]here is ample authority for the proposition that under certain conditions a part of the purchase price received upon trust or under such a binding obligation is to be excluded from gross income. Examples of this are found in trusts the income from which is required to be used for the perpetual care of the cemetery lots which are sold. [Citations omitted.] But the creation of a trust into which a portion of the purchase price is paid is not in and of itself sufficient to prevent the trust money from being treated as income. * * * [T]he decisive feature in each case is the terms and provisions of the particular trust involved. The question of control by, and inurement to the benefit of, the taxpayer, are of prime importance. In each [of the cases holding payments to the fund includible in gross income] the Court was of the opinion that the terms of the trust to promote future capital improvements in the taxpayer's property, was for the taxpayer's benefit, and accordingly was taxable income."

In this case, of course, payments into the permanent care and maintenance fund were not included in taxpayer's income, but the principle stated above is equally applicable to a withdrawal of a portion of a trust fund to be used to further taxpayer's capital improvements and such a withdrawal constitutes income to taxpayer in the amount so withdrawn. The reason for the rule is noted in Memphis Memorial Park v. Commissioner of Internal Revenue, 28 B.T.A. 1037, 1041–1042 (1933):

"Here petitioner seeks to exclude from its income amounts expended, or to be expended, for improvements to its own property. From those improvements it reaped a benefit through increased sales * * *. As a practical matter, it is obvious that some expenditure for improvements was necessary if petitioner was to carry out the purpose for which it was organized—the sale of burial plots * * *. Also obvious is the desirability of constructing * * * permanent improvements beyond those essential to a beginning of operations for the reason that, as the property in general is improved, it becomes easier to make sales, and prices may be increased."

Taxpayer contends that it received no taxable economic benefit because of restrictions accompanying the transfer of funds from the trust. Taxpayer reasons that Minnesota law defines the conditions under which the corpus can be invaded and limits allocation of a portion of the corpus to a use for the benefit of the true beneficiaries of the trust, the lotholders. Thus, taxpayer views its withdrawal of the $50,000 as in furtherance of the prescribed and authorized mandate of the trust with the lotholders being beneficiaries of that mandate.

However, 20 M.S.A. § 306.79, the statute authorizing the withdrawal, implicitly recognizes that funds withdrawn will not be used primarily for the benefit of lotholders. The statute provides that the principle of the permanent fund shall remain intact and inviolable and invested by the trustee in certain securities only, except that the taxpayer may authorize the withdrawal of a certain percentage of the fund for specified purposes, and after such a withdrawal the trustee is discharged from further liability for that part of the fund so withdrawn. Taxpayer's officers testified that the trustee was not present at the meeting at which taxpayer resolved to withdraw the $50,000 and that they did not know if the trustee was consulted about the withdrawal. Neither factor was necessary as the option to withdraw rested with taxpayer.

Thus, the statute does not provide that authorized withdrawals from the fund be utilized solely for the benefit of

lotholders; and the trustee failed to treat the $50,000 as retaining its character as funds held for the lotholders' benefit. Dispositive is the fact that taxpayer used the $50,000 in an administration building which serves primarily its profit-making interest and only incidentally the interest of lotholders.

 Taxpayer's contention that the $50,000 represented a contribution to its capital is not well taken. If the "contribution" is required as a prerequisite to obtaining other benefits, then it cannot be considered a "contribution" to the transferee's capital. United Grocers, Ltd. v. United States, 308 F.2d 634, 640 (9 Cir. 1962). Likewise, the $50,000 disbursement that taxpayer received from the fund was in the nature of compensation for the services of taxpayer in maintaining the cemetery lots. Monte Vista Burial Park, Inc. v. United States, 340 F.2d 595, 597 (6 Cir. 1965). The $50,000 in nowise was a contribution to the capital of taxpayer.

Of course, the funds in the trust, although representing payment for services to be rendered, were initially not subject to taxation because of taxpayer's lack of dominion or control over the funds. However, when a portion of the funds came back into the hands of taxpayer to be used for a capital improvement, that portion became subject to taxation as income. Otherwise, the "fund * * * proves to be nothing more than a conduit, channelling the money from the purchaser to the beneficial use of the petitioner." National Memorial Park v. Commissioner of Internal Revenue, 145 F.2d 1008, 1013 (4 Cir. 1944), cert. denied 324 U.S. 858, 65 S.Ct. 861, 89 L.Ed. 1416. Here the $50,000 withdrawal from the fund was a diversion of the fund *pro tanto* from the lotholders to the taxpayer to be used by the taxpayer in its profit-making activities.

The taxpayer contends in its brief that the $50,000 withdrawal cannot be classified as a § 111 recovery for various reasons and the government agrees that it is not excludable from gross income under the provisions of § 111 of the Code. We, therefore, fail to perceive the purpose of injecting this issue in the case. It appears obvious that § 111 is not applicable because "the tax benefit rule may be invoked only where there is a recovery which is directly attributable to a previous loss which produced no tax benefit." Waynesboro Knitting Company v. Commissioner of Internal Revenue, 225 F.2d 477, 480 (3 Cir. 1955). There has been no loss and the taxpayer did receive a tax benefit when it was allowed to deduct the funds contributed to the trust.

Judgment affirmed.